The Baltimore Belt Railroad Company *vs.* Susan S. Baltzell and William H. Baltzell, Trustees.

*Eminent domain—Condemnation of Land for Railroad purposes—Procedure—Summoning jury—Notice—Constitutional law—Sec. 167 of Art. 23 of the Code.*

Section 167 of Article 23 of the Code provides that a railroad company may agree with the owner for the purchase of any land which may be needed for the proper construction of its road; and if they cannot agree, application may be made to a justice of the peace, who shall thereupon issue his warrant to the sheriff of the county, requiring him to summon a jury of twenty persons to meet on the premises on a day named in the warrant, when the company and the owner may each strike off four persons, and the remaining twelve shall act "as the jury of the inquest of damages." HELD:

Baltimore Belt Railroad Co. *vs.* Baltzell.

That the statute necessarily implies that notice shall be given to the owner by the company, or its authorized agent.

The notice to which the owner is entitled is such as will afford him the opportunity of submitting to the jury such evidence as he may deem necessary in regard to the value of his property.

Section 167 of Article 23 of the Code which provides that the compensation to be paid to the owner of property condemned for the use of a railroad company, shall be assessed by a special jury summoned on warrant, is in no way repugnant to the constitutional provision that prohibits the enactment of a law authorizing private property to be taken for public use without just compensation as agreed upon between the parties, or awarded by a jury, being first paid, the term "jury" so used, not being limited to a common-law jury; the Constitution, while declaring that the compensation shall be assessed by a jury, having left to the Legislature to provide whether such assessment shall be made by a common-law jury, or by a jury summoned by warrant.

APPEAL from the Circuit Court No. 2 of Baltimore City.

This appeal was taken from the decree of the Court below perpetually enjoining The Baltimore Belt Railroad Company, its president, directors, and agents from instituting any proceedings for the condemnation of any of the land of the plaintiffs, mentioned in the bill of complaint and shown in plaintiffs' Exhibit C, and more especially from making any application to any justice of the peace for the issue of any warrant to the sheriff of Baltimore City, to require him to summon a jury to value the damages which the plaintiffs may sustain by the use and occupation of their property, required by the said Baltimore Belt Railroad Company, and from taking any proceedings whatever for the obtention of an inquisition upon the land of the said plaintiffs. The case is stated in the opinion of this Court.

The cause was argued before ALVEY, C. J., ROBINSON, IRVING, BRYAN, FOWLER, and McSHERRY, J.

Baltimore Belt Railroad Co. *vs.* Baltzell.

*\*Hugh L. Bond, Jr., John K. Cowen,* and *William A. Fisher,* (with whom was *W. Irvine Cross,* on the brief) for the appellant.

The following authorities were referred to : *Murray's Lessee, et al. vs. Hoboken Land and Improvement Co.,* 18 *How.,* 272; *Hurtado vs. People of California,* 110 *U. S.,* 516; *Gwynn vs. Jones' Lessee,* 2 *G. & J.,* 173; *Compton vs. Balto. & Susq. R. R. Co.,* 3 *Bland,* 386; *Adams vs. Brenton,* 3 *H. & J.,* 124; *Bingham vs. Serle,* 5 *East,* 534; *The Case of the Isle of Ely,* 10 *Coke Rep.,* 142; *Sir Oliver Butler's Case,* 2 *Ventris,* 344; *Ex parte Vennor,* 3 *Atkyns,* 767; *Queen vs. Trustees of Swansea Harbour,* 8 *Ad. & Ell.,* 439; *Tidewater Canal Co. vs. Archer,* 9 *G. & J.,* 479; *Ches. & Ohio Canal Co. vs. Grove,* 11 *G. & J.,* 398; *Balto. & Susq. R. R. Co. vs. Compton,* 2 *Gill,* 20; *Hamilton vs. Annapolis & Elk R. R. Co.,* 1 *Md.,* 553; *Balto. & Poto. R. R. vs. Magruder,* 34 *Md.,* 79; *Balto. & Havre de Grace Turnpike Co. vs. Northern Cent. R. R. Co.,* 15 *Md.,* 193; *Balto. & Havre de Grace Turnpike Co. vs. Union Rwy. Co.,* 35 *Md.,* 224; *Harness vs. Ches. &. Ohio Canal Co.,* 1 *Md. Ch. Dec.,* 248; *The Bellona Company's Case,* 3 *Bland,* 442; *Compton vs. Susq. R. R.,* 3 *Bland,* 386; *Western Maryland R. R. Co. vs. Patterson,* 37 *Md.,* 125; *George's Creek Coal & Iron Co. vs. New Central Coal Co.,* 40 *Md.,* 425; *Brown vs. Phil., Wilm. & Balto R. R. Co.,* 58 *Md.,* 539; *C. & P. R. R. Co. and B. & O. R. R. Co. vs. Pa. R. R. Co., in Md.,* 57 *Md.,* 267; *Binney's Lessee vs. C. & O. Canal Co.,* 8 *Peters,* 214; *C. & O. Canal Co. vs. Union Bank,* 8 *Peters,* 259; *Custiss vs. Turnpike Co.,* 6 *Cranch,* (*S. C.*) 233; *C. & O. Canal Co. vs. Key,* 3 *Cranch C. C.,* 599; *B. & O. R. R. Co. vs. Van Ness,* 4 *Cranch C. C. Rep.,* 595; *C. & O. Canal Co. vs. Binney,* 4 *Cranch C. C. Rep.,* 68; *C. & O. Canal Co. vs. Union Bank,* 4 *Cranch C. C. Rep.,* 75; *Davidson vs. New Orleans,* 96 *U. S.,* 97; *Weimer vs. Bunbury,*

*\*Mr. Bond, though present at the hearing, did not participate in the argument.

Baltimore Belt Railroad Co. *vs.* Baltzell.

30 *Mich.*, 213, 215; *Eames vs. Savage*, 77 *Maine*, 212; *Mayor, &c. of Baltimore vs. Ritchie*, 51 *Md.*, 243, 4; *Tracey vs. Elizabethtown, &c. R. R. Co.*, 80 *Kentucky*, 259; *Hagar vs. Reclamation District*, 111 *U. S.*, 711; *Pennoyer vs. Neff*, 95 *U. S.*, 727; *Windsor vs. McVeigh*, 93 *U. S.*, 274, 279; *Kramer vs. Cleveland & P. R. R. Co.*, 5 *Ohio State*, 140; *Harper vs. Lexington & O. R. R. Co.*, 2 *Dana*, 227; *Swan vs. Williams*, 2 *Michigan*, 427; *Stewart vs. Hinds County Police Board*, 25 *Miss.*, 479; *Johnson vs. Joliet & C. R. R. Co.*, 23 *Ill.*, 202; *Spencer vs. Merchant*, 125 *U. S.*, 355, 6; *Ulman vs. Mayor, &c. of Baltimore, et al.*, 72 *Md.*, 593; *State vs. Wayman*, 2 *G. & J.*, 256.

*J. Wilson Leakin,* \**Henry E. Baltzell,* and *Arthur W. Machen,* for the appellees.

Reference was had to the following authorities: *Ulman vs. Mayor, &c. of Baltimore,* 72 *Md.*, 587; *Mayor, &c. of Baltimore vs. Johns Hopkins Hospital,* 56 *Md.*, 1; *Stuart vs. Palmer,* 74 *N. Y.*, 183; *Wilson vs. Balto. & P. R. R. Co.*, 5 *Del. Ch.*, 547; *Chicago, &c. Railway Co. vs. Minnesota,* 134 *U. S.*, 418, 457; *Mayor &c. vs. Ritchie,* 51 *Md.*, 244, 246; *Lewis on Eminent Domain,* secs. 365, 368; *Kuntz vs. Sumption,* 117 *Ind.*, 1; *Mulligan vs. Smith,* 59 *Cal.*, 230; *East Kingston vs. Towle,* 48 *N. H.*, 57; *Burns vs. Multonomah,* 8 *Sawyer,* 551, 552; *State ex rel. Flint vs. Fond du Lac,* 42 *Wisc.*, 298; *Seefert vs. Brooks,* 34 *Wisc.*, 446; *County of San Mateo vs. R. R. Co.*, 8 *Sawyer,* 238; *Elliott on Roads and Streets,* 150, 151, 152; *Scharf vs. Mayor, &c. of Baltimore,* 54 *Md.*, 499; *Johnson vs. Chicago,* 119 *U. S.*, 389; *Cooley Constitutional Limitations,* (4th *Ed.*), 497; (6th), 623; *Hopkins vs. Orr,* 124 *U. S.*, 510; *Beall vs. New Mexico,* 16 *Wallace,* 535; *Moore vs. Huntingdon,* 17 *Wallace,* 423; *Bradford vs. Jones,* 1 *Md.*, 369; *Minor vs. Hap-*

\*Present, but took no part in the argument.

*persett,* 21 *Wall.*, 162, 178; *Lamb vs. State,* 4 *Ohio,* 177; *Lewis on Eminent Domain, sec.* 314; *Kansas vs. Story,* 96 *Mo.,* 621; 68 *Ill.,* 286; *Chicago vs. Sanford,* 23 *Mich.,* 415; *Smith vs. Atlantic, &c.,* 25 *Ohio,* 91; *Bushey vs. Culler,* 26 *Md.,* 534; *Wilson vs. Boor,* 40 *Md.,* 483; *Huling vs. Kaw Valley Railway,* 130 *U. S.,* 559; *Kohl vs. the United States,* 91 *U. S.,* 367, 375; *United States vs. Jones,* 109 *U. S.,* 13; *Lent vs. Tillson,* 140 *U. S.,* 328; *The Barque Chusan,* 2 *Story,* 469; *Burnham vs. Dalling,* 3 *C. E. Green (N. J.,)* 134.

ROBINSON, J., delivered the opinion of the Court.

This is a bill to restrain the appellant, a railroad company, from proceeding to condemn certain real estate held by the appellees as trustees. The company's powers of condemnation are derived from section 167, Article 23 of the Code, which provides in the first place, that the company may agree with the owner for the purchase of any property which may be needed for the construction of its road, and if the owner be an *infant, non compos,* or a *married woman,* or a *non-resident,* application may be made by the company to a justice of the peace, who shall thereupon issue his warrant to the sheriff of the county, requiring him to summon a jury of twenty, qualified to act as jurors under the laws of the State, to meet on the premises on a day named in said warrant, and from the panel thus selected, the company and the owner, may each strike off four persons, and the remaining twelve shall act as *"the jury of the inquest of damages."* It further provides that the jury shall reduce their inquisition to writing, and sign and seal the same, and that it shall then be returned by the sheriff to the clerk of the Circuit Court, and shall be confirmed by the Court at its next session, unless cause to the contrary be shown.

This statute, it is contended, is in violation of the constitutional rights of the land-owner, as guaranteed

by the Constitution of this State, which declares that no
one ought "to be deprived of life, liberty, or property
but by the judgment of his peers or by the law of the
land;" and as guaranteed also by the Constitution of the
United States, which declares that no State shall pass
any law "to deprive any person of life, liberty, or prop-
erty, without due process of law." *Fourteenth Amend-
ment, Constitution of the United States.*    "The law of
the land" and "due process of law",as here used, it can
hardly be necessary to say, mean the same thing.    It is
in violation of these constitutional limitations, it is
argued, because no provision is made by the statute for
notice to the owner; and that the taking of one's prop-
erty for a public use, without notice and an opportunity
to be heard, cannot be considered "due process of law"
within the meaning of the Constitution.    Now, what
constitutes "due process of law," has been the subject
of a good deal of consideration, not only by the Courts of
this and other States, but by the Supreme Court of the
United States also, especially since the adoption of the
Fourteenth Amendment, and after all that has been said
and written, it may not be easy to define it, so as to em-
brace every case.    Generally speaking, however, due
process of law may be said to mean a course or mode of
proceeding according "to the well settled maxims of
law, and under such safe-guards for the protection of
individual rights as such maxims prescribe for the class
of cases to which the one in question belongs."    All
agree that it does not "necessarily imply a regular pro-
ceeding in a Court of justice, or after the manner of
such Courts."    *Davidson vs. New Orleans,* 96 *U. S.*, 97.
On the contrary, in the leading case of *Murray's Lessee
vs. Hoboken Land & Improvement Compy.,* 18 *Howard,*
272, where the property of a defaulting public officer
was sold under a *distress warrant* issued by the Secretary
of the Treasury in pursuance of an Act of Congress, the

proceeding was held to be due process of law, because it was in conformity with the usual and customary proceedings in such cases, recognized alike by the common law and the statute law of England. After stating that the phrase was equivalent "to the law of the land," and that its meaning was to be ascertained from the practice of the English Courts, and from the English statutes subsequent to the time of *Magna Charta,* Mr. Justice CURTIS says, "Though due process of law generally implies and includes *actor, reus, judex,* regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceeding, yet this is not universally true. There may be and we have seen that there are cases under the law of England after *Magna Charta,* and as it was brought to this country, and acted on here, in which process in its nature final, issues against the body, lands, and goods of certain public debtors without any such trial."

But there is a wide difference between the summary process sanctioned by the common law for the collection of the *public revenue,* and the taking of one's property under the power of *eminent domain for a public use.* And we think it may be safely said that there never has been a time in the constitutional history of England, much less in this country, when one could be lawfully deprived of his property for public use without notice and an opportunity to be heard. There was, it is true, an *ex parte* proceeding under the ancient writ of *"ad quod damnum,"* issued by the Court of Chancery in pursuance of an Act of Parliament passed in 1299, by which the sheriff was directed to summon a jury to inquire whether a grant to a *religious use* would be to the damage of the king and others. And this writ was in the course of time used in the condemnation of private property for public uses. And, although the writ issued upon an *ex parte* application, yet, if the inquisition was found,

and the property condemned without notice to the owner, this in itself constituted a sufficient ground for setting aside the inquisition. As far back as *Vennor's Case,* 3 *Atkyns,* 766, where an application was made to quash the writ, Lord HARDWICKE said: "The only proper question is whether there has been any surprise in the execution of this writ on the persons petitioning, by preventing them from laying evidence before the jury at the time of the inquisition, or before the justices, on the appeal." And this writ, it appears, was also used during the colonial government, especially for the condemnation of mill-seats and other like public uses, but the inquisition as found, was always subject to be set aside for any reason that would have been sufficient to quash the writ at common law. So whatever conflict of opinion there may have been in the case of *Mayor, &c., of Baltimore vs. Johns Hopkins Hospital,* 56 *Md.,* 1, and in the case of *Ulman vs. Mayor, &c., of Baltimore, et al.,* 72 *Md.,* 587, 609, on the part of this Court as to the necessity of notice in the exercise of the *taxing power,* we all agree that in *taking property under the power of eminent domain,* the owner is entitled to notice, and the opportunity to be heard. And the learned Judge below, and Mr. *Lewis* in his treatise *on Eminent Domain,* have both fallen into error in construing the case of the *George's Creek Coal and Iron Company vs. New Central Coal Company,* 40 *Md.,* 425, as a decision to the contrary. In that case the land owner not only had notice, but was heard by the jury of inquest, and the inquisition was set aside by the Court for the reasons set forth in the petition filed by the owner. Subsequently, the Court directed a new inquisition, and the owner moved to quash the new writ on the ground that *it was issued* by the Court without notice, and upon this motion the Court decided that the owner was not entitled as matter of right to notice, either of the original application to the justice of the peace or of

that to the Court for a new inquisition when the first had been set aside. But the question whether the owner was entitled to notice upon the execution of the writ and the condemnation of the property was not presented by the record, nor was it considered by the Court. And so in *Western Maryland R. R. Co. vs. Patterson*, 37 *Md.*, 125. The property had been condemned and the damages had been awarded, and the inquisition had been returned to the Superior Court, and a bill was filed in equity by the owner to restrain the Superior Court from confirming the inquisition, not on the ground of *want of notice*, but because the inquisition condemned a *fee simple interest*, and for other reasons. And the Court decided that the Superior Court had jurisdiction of the subject-matter, with power to confirm or set aside the inquisition, and there was no ground for the interference of a Court of equity. In delivering the opinion of the Court Judge Bowie, however, does say, that no summons or notice to the owner is in most cases provided, but this *side-remark* is not to be construed as a decision of this Court that notice was not in such cases required. This question was not before the Court. Being then of opinion that the owner is entitled to notice, and the opportunity to be heard, the question is whether the statute now under consideration is invalid, because it fails to provide for such notice. And in considering this question we cannot overlook the historical argument, as it may be termed, which was pressed with so much force by the counsel of the appellant. They have, with commendable industry, collected a long string of statutes, beginning with the earliest colonial legislation and coming down to the present time. And passing by the earlier acts for the condemnation of mill-seats and other like uses, we find that all the great works of public improvements in this State—the Chesapeake and Ohio Canal Company, the Baltimore and Ohio Railroad Company, the Balti-

more and Washington Railroad Company, the Baltimore and Susquehannah Railroad Company, the Annapolis and Elk Ridge Railroad Company, in fact, nearly all the railroads and turnpike roads,—have been built under powers of condemnation substantially the same as conferred by *Section* 167 *of Art.* 23. The Reports of this State are filled with cases, in which these charters and the condemnations under them have been the subject of judicial consideration, and these cases have been argued by the most eminent and learned counsel in the State, and it does not appear that it ever occurred to the Court or to the counsel that such condemnations were invalid, because the statutes under which they were made did not provide notice to the owner. But not only in this State, but in the District of Columbia, we find works of internal improvements constructed and property condemned under Acts of Congress substantially the same in terms as the one now before us. And condemnations under these Acts have been a fruitful source of litigation, not only in the Circuit Court, but in the Supreme Court, and, though the Constitution declares that Congress shall pass no Act depriving any person of property, "without due process of law"—Fifth Amendment—it does not appear that it was ever suggested that these Acts were in violation of the constitutional rights of the owner. This legislative construction and judicial recognition of the validity of these statutes for a period of more than fifty years are entitled to some weight, at least, in deciding whether they are in violation of the Constitution,—an objection now made for the first time to their validity.

But we do not rest, nor is it necessary to rest, our decision in favor of the validity of the Act in question on this ground, because by every fair rule of construction the Act itself, we think, necessarily implies that notice is to be given to the owner. In the first place, it provides that the Company may agree with the owner for

the purchase of the property, and it is only when the par-
ties are unable to agree, or when the owner is an infant,
*féme covert,* or laboring under some disability, that a
jury is to be summoned, and summoned, too, to meet on
the premises, which, in contemplation of law, is always in
the possession of the owner or his agent; and then *the
Company and the owner* are each to strike off four names,
thus necessarily implying the presence of and participa-
tion on the part of the owner in the formation of the
jury, and the jury as thus constituted is to decide what
compensation is to be paid to the owner, and when their
inquisition is signed it is to be returned to the Circuit
Court, thus affording an opportunity to the company and
the owner to file objections to its ratification.    Now, these
several provisions, when considered together, necessarily
imply, we think, that notice is to be given to the owner
and the opportunity to be heard.    And, as the company
is the party asking the condemnation of the property—
*the actor in the proceeding*—it may be fairly inferred that
such notice is to be given by the company or its author-
ized agent.    And such, so far as we are advised, has been
the uniform practice in this State.    But then, it is asked,
how is notice to be given to owners who are infants,
married women and non-residents? The Act does pro-
vide for the condemnation of property belonging to per-
sons laboring under these disabilities, and whether it is to
be construed as authorizing notice to be served on the
*guardian,* or *husband,* or by *order of publication,* are ques-
tions not necessary to be considered in this case, because
we are now dealing with a case in which the owner is
*sui juris,* and upon whom personal notice may be served.
It will be time enough to consider the question of notice as
to infants and *fémes covert* when that question arises.
So, if the constitutional validity of this Act is to be
tested, as the counsel for the appellee contends, not by
what *has been or may be done under it, but by what it requires*

*to be done,* it is, it seems to us,. free from objection on this ground. Being entitled to notice, the question is, at what time shall such notice be given? The Act requires, as we have seen, that the inquisition shall be returned to the Circuit Court for confirmation, and the argument is, that if the owner has the opportunity to file objections to its confirmation, this is all the notice to which he is entitled. To this, however, we cannot agree. It has been held, it is true, in some cases where a special tax or assessment has been imposed upon property for the public use, and provision is made for contesting the validity of such assessment and the amount, "in the ordinary Courts of justice, with such notice to the person, or such proceeding in regard to the property as is appropriate to the nature of the case, the judgment in such proceedings cannot be said to deprive the owner of his property without due process of law." *Davidson vs. New Orleans,* 96 *U. S.,* 105; *Hagar vs. Reclamation District,* 111 *U. S.,* 701. But the question here is one to be decided under the Constitution and laws of this State, and the Constitution declares "that the General Assembly shall enact no law authorizing private property to be taken for public use without just compensation as agreed upon between the parties or awarded by a jury, being first paid or tendered to the party entitled to such compensation." *Sec.* 40, *Art.* 3. It is *the compensation to be awarded by a jury. The jury is the tribunal, and the sole tribunal,* by whom the amount of compensation is to be determined, and, this being so, it would seem but fair and reasonable that the owner should have the opportunity of submitting to the jury such evidence as he might deem proper in regard to the value of his property. The inquisition, it is true, must be returned to the Circuit Court for confirmation, but that Court hears and decides the objections filed to its confirmation, without the *intervention of a jury.* The con-

firming Court has no power to increase or diminish the compensation awarded by the jury. Its jurisdiction is confined to the confirmation or setting aside the inquisition, and, if set aside, of ordering a new inquisition. And to hold that notice and the right to contest the confirmation of the inquisition is sufficient, would be to deprive the owner of the right and opportunity of being heard before the jury of inquest, the very tribunal by which the compensation is to be awarded. And, besides, the Act in requiring the owner to strike the jury, necessarily implies that he is to have notice before the jury is sworn, and by notice we mean *reasonable notice*, in order that he may offer such evidence as he may deem necessary in regard to the question of damages. And, this being so, it is unnecessary to consider whether section 248 of Art. 23 of the Code applies to the condemnation of property by a railroad company, for, so conceding, for the sake of the argument, we are of opinion that in proceeding to condemn property under that section the owner would be entitled to notice before the property was condemned, and that *notice* of the pendency of the inquisition in the Court for confirmation, would not in itself be *such a notice* as the law requires.

And this brings us to the last objection urged against the validity of sec. 167, and that is, the power of the Legislature to provide that the compensation to be paid to the owner shall be assessed by a special jury summoned upon warrant. The language of the Constitution, is, that "the General Assembly shall enact no law authorizing private property to be taken for public use without just compensation, as agreed upon between the parties or awarded by a jury, being first paid;" and it is said that this means a *common law jury*, and a *regular trial* in Court. But for the opinion of the Judge below, it would not have occurred to us there was any difficulty as to this question. Ordinarily, it is true, the term

"jury" used in a Constitution or a statute will be understood as meaning a common law jury, and, if no other jury had been known in law at the time of the adoption of the Constitution of 1851, this argument might have been unanswerable. But it is conceded from the earliest colonial history, and from the formation of the State Government down to the adoption of the Constitution, the Legislature had provided for the taking of private property for public use, upon making compensation to the owner, as assessed by *a special jury summoned* on warrant. At the same time the Legislature provided that, in the opening and altering streets and laying out county roads, the assessment of damages should be made by examiners or commissioners, with the right of appeal to a Court of record, where the question of damages was tried *de novo* before a jury. But as to railroads, the Legislature without exception, provided that the compensation should be awarded by a special jury summoned as directed by sec. 167. We have then a common law jury for streets and county roads, and a special jury for condemnation in railroad proceedings; and when the Constitution says where property is taken for public use the owner shall be entitled to compensation awarded by a jury, why shall it be held to mean compensation awarded exclusively by a common law jury in a regular Court trial? The only question before a jury in such cases is the question of compensation, and a jury summoned by warrant to meet on the premises *in view* and with the opportunity of seeing the property, ought to be quite as competent to decide that question, to say the least, as a common law jury sitting in a common law Court. And, besides, in two-thirds of the counties of this State, there are but *two jury terms* a year, each about six months apart, and we can hardly suppose the framers of the Constitution meant to delay and embarrass the construction

of railroads and other public improvements, by requiring compensation to be awarded in Court by a common law jury. At least, if such had been the intention, if they intended to deny to the Legislature the exercise of a power in this respect,—a power which had been exercised from the beginning of the Government,—it is but fair to presume this intention would have been declared in plain and explicit terms. What they did mean, was to provide in the first place that the owner should have the right or privilege of a jury of twelve men in determining what compensation was to be paid, and in the next, that he should not be deprived of his property till such compensation had been paid. And such has been the uniform construction of this clause of the Constitution from the time of its adoption till the present. The Legislature, at every session since 1851, has provided for the taking of private property needed in the construction of railroads and other like improvements upon the payment of compensation assessed by a jury summoned upon warrant. The validity of the condemnations made under these Acts have been considered by this Court in case after case, and the power of the Legislature in this respect has never before been questioned. Such has been the contemporaneous interpretation of the Constitution by the Legislature, and the Bench and the Bar, for a period of forty years. While the Constitution declares that the compensation shall be assessed by a jury, it at the same time leaves to the Legislature to provide whether such assessment shall be made by a common law jury or by a jury summoned by warrant, as may be most expedient and proper. For these reasons the order appealed from will be reversed, and the bill dismissed.

*Order reversed, and*
*bill dismissed.*

(Decided 10th December, 1891.)