774 A.2d 1136

**Jack D. CLARK**

v.

**STATE of Maryland.**

**No. 102, Sept. Term, 2000.**

Court of Appeals of Maryland.

June 26, 2001.

612

Geraldine K. Sweeney and Amy E. Brennan, Asst. Public Defenders (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Sarah Page Pritzlaff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

HARRELL, Judge.

On 7 October 1982, George Wilker and Lurty Wood were murdered in the course of an attempted robbery at a bar in Baltimore County. Fifteen years later, Jack D. Clark, Petitioner, was arrested and charged with the crimes. In the Circuit Court for Baltimore County, a jury convicted Petitioner of two counts of first degree felony murder, one count of attempted armed robbery with a deadly weapon, and one count of the use of a handgun in the commission of a crime of violence. The trial judge sentenced him to life imprisonment and life concurrent for the felony murders, twenty years concurrent for the attempted robbery with a deadly weapon, and twenty years concurrent(the first five to be served without the possibility of parole) for the use of a handgun in the commission of a crime of violence. On appeal, the Court of Special Appeals, in an unreported decision, affirmed. We granted Petitioner's petition for writ of certiorari, *Clark v. State*, 362 Md. 34, 762 A.2d 968 (2000), to address the following questions:

1. Where the fifteen year pre-indictment delay caused Petitioner conceded and substantial actual prejudice to the presentation of his defense, could his due process claim be defeated because he did not prove that the State purposefully delayed so as to gain a tactical advantage?

2. Where trial was held sixteen years after the crimes occurred, was it error to preclude Petitioner from questioning the State's star witness about an intervening injury which caused memory problems?

## I.

On 7 October 1982, at approximately 5:30 a.m., George Wilker and Lurty Wood were shot to death during the course of a robbery attempt at a bar called the Alcove, located on Pulaski Highway in Baltimore County. The crimes were investigated by the Baltimore County Police. Detective Capel was the chief investigator. Certain interviewed witnesses reported seeing four suspicious men, one of whom wore a red bandana around his neck, in the bar the night before the murders. Other witnesses reported speaking with four men, one of whom displayed a gun, in the parking lot of the bar the night before the murders. The police also questioned three eyewitnesses to the attempted robbery. Two of the eyewitnesses, George Barnstorf, the bar owner, and a Mr. Trotter, saw a man, wearing a bandana over his mouth, with one of the victims just before the shooting. A third eyewitness, a Mr. Moog, told police he saw two white males beating one of the victims before that victim was shot.

The police focused their initial investigation on four suspects—Petitioner, Julius (Bo) Stallings, Chadwick Gregory Grimes (Chad), and Charles Michael Grimes (Michael). Photo arrays, including pictures of Petitioner, Chad Grimes, and Michael Grimes, were shown to Barnstorf and Trotter. Neither was able to make an identification.[1] There is no record of photographs being shown to Moog.

Also during the initial investigation, a red bandana was found near the point of entry the perpetrators used to enter the bar. Two hairs were found on the bandana. These two hairs, plus hair samples from Chad and Michael Grimes, were sent to the FBI for analysis in October 1982. One hair was consistent with that of Chad Grimes's sample. The other hair was inconsistent with both of the samples supplied by Chad and Michael Grimes.

---

**1.** Detective Capel's file contains the notation "unable to make identification." Detective Capel, who retired in 1986, was living out-of-state at the time of Clark's trial and was not called to testify.

Detective Capel questioned each of the four suspects and thereafter completed an Application for a Statement of Charges for each of them. Although the police believed they had enough evidence to charge the four suspects, they questioned whether they had sufficient evidence at this time for the State to mount a successful prosecution. Thus, the Applications were never submitted to a court and the case remained unsolved and dormant in police homicide files from 1986 until 1996.

On 16 September 1998, at the pretrial motion to dismiss hearing in Petitioner's prosecution, Detective Phillip Marll, who started in the homicide division on 15 September 1986, but did not familiarize himself with the Alcove bar murders case until sometime in 1996, testified regarding the dormancy of this case:

[PETITIONER'S TRIAL ATTORNEY]: Is there a reason why a double homicide case would not be worked for a period of approximately ten years, sir?

[MARLL]: The only answer to that, I think in Baltimore County, going back to the early '50s, we have about one hundred eighty open homicide cases. You take that and you couple it with a caseload of active cases that are coming in, and speaking from '86 on, thirty-five to forty-five murders per year, that would be why we wouldn't generally be able to take some time in going back over old cases.

Within the last few years the old cases had become something of a[n] interest to go back on and work on, but it's nothing—we don't have, if you will, an old case squad. There's nothing that compels us to go back and work the old cases.

And there was nothing in '86, actually through '96, that forced us to go back and work old cases. So the case would be sitting back there. It's not closed. If any information came in on it, somebody would have grabbed up on it and ran with it.

So this case, along with the other hundred seventy, hundred eighty other cases that were sitting back there

were just waiting for a matter of a phone call from '86 to '96, I would say.

Detective Marll, with his partner, Detective Tincher, became inspired to re-investigate the murders as the result of driving by the Alcove Bar while it was being torn down in 1996. Seeing the demolition, they "both commented, 'I wonder what happened with the double homicide that occurred there.'" Curiosity piqued, they pulled the case file. After examining the file, Detective Marll decided to pursue it further. He admitted, however, that in 1996 the case was a "back-burner" issue that he and his partner worked on between their active cases, as time permitted.

The detectives began the re-investigation by updating information in the file. They shortly learned that two of the eyewitnesses had died, Barnstorf in 1985 and Trotter in 1995, and that Bo Stallings, one of the four original suspects, died in 1989.

Detective Marll focused his investigation on Chad Grimes because of the evidence that it may have been his hair that was found in 1982 on the bandana. He was forced to abandon this avenue, however, when Chad Grimes was murdered in Baltimore City in January 1997. Marll then focused on Chad's brother, Michael Grimes.[2] Believing there was sufficient probable cause, Marll obtained an arrest warrant for the surviving Grimes brother based on essentially the same facts used by Detective Capel in the unfiled 1982 Application for Statement of Charges.[3]

When questioned in 1982, Michael Grimes had denied knowledge of the crimes. When questioned in 1998 by Detec-

---

**2.** Detective Marll explained his decision to focus on Michael Grimes, rather than on Petitioner:

He's the brother of Chad Grimes. Chad Grimes was the first person we were going to go after, and figure if anybody, with Chad Grimes'[s] hair on the bandanna, after Chad Grimes, if anybody to pursue, it's Charles Michael Grimes, his brother.

**3.** Detective Marll testified to this effect:

tives Marll and Tichner, Michael Grimes claimed to have lied in 1982 and implicated himself and Petitioner in the crimes. In addition, he agreed to plead guilty and to testify against Petitioner. Petitioner was arrested at his home in North Carolina the day after Michael Grimes was questioned.

Petitioner's trial was scheduled for 15 October 1998. Prior to trial, the State sought additional DNA testing of the red bandana, which remained in police custody. On 8 October 1998, the trial date was postponed to allow time for the DNA testing to be completed. The State was permitted to have an expert at Cellmark Laboratories perform polymerase chain reaction (PCR) DNA testing on a spot of saliva found on the bandana. The results of the testing supplied a profile from which Petitioner could not be excluded. This DNA evidence was introduced at trial.

Also before trial, Petitioner's trial attorney filed, on 9 September 1998, a motion to dismiss, alleging that the pre-indictment delay deprived Petitioner of due process. Petitioner's trial attorney proffered several ways in which the defense had been prejudiced by the delay of fifteen years, including the death of an alibi witness, the death and/or other loss of potentially exonerating eyewitnesses, and the loss of evidence tending to incriminate one of the other suspects. Specifically, as Petitioner's trial counsel expounded at the hearing on the motion to dismiss, Jean Rinesman, Petitioner's claimed alibi witness, had died; eyewitnesses Barnstorf and Trotter had died; and the third eyewitness, Moog, could not be located. Petitioner's defense attorney argued that these circumstances prejudiced Petitioner's case:

> Back when, I guess, when the case was hot, so as to speak, each [4] of these men were shown photo arrays on separate

---

I think the only thing else we had in the statement of charges—and I can check verbatim, if you wish—that's correct—we put in that Chad was dead, we put Bo Stallings was dead.

4. As noted, *supra* p. 615, the record reflects that apparently only Barnstorf and Trotter were shown photo arrays.

days. Each photo array contained a picture of [Petitioner]. And there was no identification made.

I think I can probably get around that by calling people to the stand that compiled the photographic array and ask them certain questions that don't obviously call for a hearsay response.

But what I am losing is something that I can't prove because these witnesses are dead, and that's the opportunity to bring these gentlemen into court and perhaps have them get a good look at [Petitioner] and say, "That's not the guy I saw do all these horrible things that night." Not just say, "I don't know, I can't say if it is him or if it's not him," but actually the potential would exist, your Honor, that they would say or could say, "I'm certain that that's not the person that was observed." That opportunity is gone.

Additionally, Petitioner's attorney noted, as mentioned *supra*, two of the four original suspects were dead. One of the suspects, Bo Stallings, apparently previously admitted to a man named Mike Miller that he, Stallings, was involved in the murders; both Stallings and Miller were dead, however, before Petitioner was charged.

The prosecutor expressly conceded that there had been prejudice to Petitioner's defense during the fifteen year lapse before charges were filed:

I mean, we will concede there's prejudice with regard to Barnstorf, Trotter, Miller, and all of the significant points he brought up as well as he argues. We believe we have also been prejudiced because of the delay as well. And we believed the reason he called Detective Marll is so they could determine the justification for the delay.

The State argued, however, citing *Smallwood v. State,* 51 Md.App. 463, 443 A.2d 1003 (1982), that dismissal was not mandated because the defense failed to prove that the State purposefully delayed indicting Clark to gain a tactical advantage.

The trial judge denied Petitioner's motion to dismiss. The judge reasoned:

The problem in this case—and the State concedes that there is prejudice with regard to the Defense in this case, and likewise, the Court believes that because of the—some witnesses are deceased at this point that there is some prejudice that has been attached to the State, because they are in a difficult position as well.

The question is whether or not the government's delay violates what is, quote, in the fundamental conception of justice and the community sense of fair play and decency.

I mean, the Court must weigh the facts, what the allegations are in this case, that the Defendant did in fact commit two murders in the course of an armed robbery. That is obviously an extremely serious case.

The testimony is clear that the State, back at the time the crimes occurred, although they had some probable cause to believe that this Defendant and others were responsible for the robbery and the crimes, they did not have sufficient evidence with which to bring indictments and to proceed before a jury or judge to present evidence which they believe could convict beyond a reasonable doubt and to a moral certainty.

There was a delay. The detectives in this case, who have been longtime homicide detectives in Baltimore County, as Detective Marll points out, by happenstance wondered what happened to the double murders at the Alcove Bar whenever they noticed it being demolished one particular day while driving down the road. They pull the case back out and attempt to resurrect what had transpired and to pursue what leads they had.

Now, there wasn't DNA testing back in the early '80's, at the time this episode occurred, and now have pursued other means of investigation.

The difference between what this case is and the *Barker*[5] case that [Defense Counsel] cites to the Court is crystal

---

**5.** *Howell v. Barker,* 904 F.2d 889 (4th Cir.1990), *cert. denied,* 498 U.S. 1016, 111 S.Ct. 590, 112 L.Ed.2d 595.

clear. In the *Barker* case, that oral argument the counsel for the State of North Carolina, presumably the Attorney General's Office or someone has in here unequivocally and candidly stated that North Carolina's justification for the pre-indictment delay was mere convenience and that the court conceded, quote, that North Carolina was negligent in not prosecuting the defendant earlier, end of quote.

There is absolutely no such circumstance in this particular case. It's clear to the Court that the State could not prosecute the Defendant back when the initial investigation took place.

And balancing the fundamental conception of justice and the community sense of fair play and decency, the Court determines that the—that it would be improper for me to dismiss the case for pre-indictment delay.

Accordingly, the motion to dismiss that's been filed is hereby denied.

On 14 April 1999, at Petitioner's trial and before the direct testimony of Michael Grimes, the trial court seemed inclined to allow Petitioner's trial attorney to ask—in a "yes or no" question format—Michael Grimes whether he had filed a Maryland Worker's Compensation claim alleging some type of psychiatric injury and disability. In this context, it seemed clear that defense counsel intended to probe further whether the reported 1991 work-related injury affected Grimes's memory.

The trial court, however, also ruled in limine that the defense could not use documents relating to Grimes's worker's compensation claim for impeachment purposes. Petitioner's trial attorney argued that the witness's ability to remember was an important issue because the witness would be testifying about events that transpired sixteen years earlier. The trial court ruled that there was nothing in the workers' compensation documents to denigrate Grimes's ability to recall the specific events at issue and that the memory problems reported by Grimes in 1991 did not relate to his veracity and credibility at the time he witnessed the 1982 events. The trial

court ruled that evidence suggesting psychiatric problems resulting from the work-related injury occurring subsequent to the 1982 events was inadmissible.

The jury ultimately convicted Petitioner. Clark appealed to the Court of Special Appeals claiming, inter alia, that he was entitled to dismissal of the charges due to the long pre-indictment delay, or that at least he was entitled to a new trial because the trial judge improperly limited his inquiry regarding the state of Michael Grimes's ability to recall accurately the 1982 events to which he testified.

The Court of Special Appeals affirmed, in an unreported opinion, the Circuit Court's judgments. The intermediate appellate court, relying on *Smallwood v. State*, 51 Md.App. 463, 443 A.2d 1003 (1982), employed a two "pronged" test to determine whether Petitioner's right to a fair trial was prejudiced improperly by the pre-indictment delay of fifteen years. Under this test, one seeking dismissal for a pre-indictment delay must prove "(1) actual prejudice to the accused, and (2) that the delay was purposefully made by the State to gain a tactical advantage over the accused." (Citing *Smallwood*, 51 Md.App. at 472, 443 A.2d at 1008). The Court of Special Appeals noted, as to the first element of the test, that it had been conceded that Petitioner was prejudiced by the "significant lapse in time between the offenses committed and the criminal trial" due to the loss of a potential alibi witness, a potential exonerating witness, two eyewitnesses, and two alleged coconspirators. The court reasoned, as to the second element, that "[m]ere delay ... absent an ulterior motive, does not necessarily deprive a defendant of due process" and that, in Petitioner's case, "there was no showing that the delay was an intentional, calculated tactic utilized by the State to obtain an advantage over [Petitioner] at trial."

With regard to the question of whether Petitioner should have been permitted to inquire, during cross-examination of the State's witness, Michael Grimes, into his medical and psychiatric history that included evidence of memory problems, reported in 1992, caused by an injury occurring in 1991,

the court answered in the negative. The Court of Special Appeals explained that the trial court did not abuse its discretion in not permitting this cross-examination because "Grimes's 1992 psychiatric problems were not a proper subject of inquiry because they did not relate to his perception at the time of the criminal incident." In reaching this conclusion, the court stated:

It is not proper to ask the witness, "Are you under the care of a psychiatrist?" People receive psychiatric treatment for many reasons that have nothing to do with any component of credibility. On the other hand, the question, "Were you suffering from schizophrenia at the time you witnessed this incident?" is not an unfair attack upon the witness's character for veracity. If the witness was indeed schizophrenic at the time of the incident, his ability to observe accurately and to retain the observation correctly may have been so impaired that his present testimony is incorrect even though he is doing his very best to supply truthful information. (Quoting JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK § 1302(D), at 506 (3d ed.1999) (citations omitted)).

We agree with the Court of Special Appeals's holding with regard to whether Petitioner was denied due process due to the fifteen year pre-indictment delay. We disagree, however, with its holding that Petitioner should not have been permitted to cross-examine Michael Grimes relating the possibility of memory problems.

## II.

### Pre-indictment Delay

Petitioner argues that the Court of Special Appeals applied the wrong test in its analysis of the question of whether due process was violated due to the pre-indictment delay. He contends instead that we should adopt a test that balances prejudice to the defense against the State's reasons for the delay. In so arguing, Petitioner submits that what the test should be represents an open question for Maryland, as there is no controlling authority from the U.S. Supreme Court or

this Court. Petitioner contends that the better-reasoned, persuasive authority employs a balancing test. Petitioner concludes that applying a balancing test to the record in the present case leads to the electable conclusion that Petitioner was denied due process.

### A. What has the U.S. Supreme Court said?

In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the U.S. Supreme Court was asked to consider whether the dismissal "of a federal indictment was constitutionally required by reason of a period of three years between the occurrence of the alleged criminal acts and the filing of the indictment." *Marion*, 404 U.S. at 308, 92 S.Ct. at 457, 30 L.Ed.2d 468. In *Marion*, the defendants argued that their Sixth Amendment right to a speedy trial[6] had been violated by a three year pre-indictment delay and that the delay was "so substantial and inherently prejudicial that the Sixth Amendment required the dismissal of the indictment." *Marion*, 404 U.S. at 313, 92 S.Ct. at 459, 30 L.Ed.2d 468. The Court determined that the Sixth Amendment did not apply because the Sixth Amendment speedy trial provision does not become engaged until indictment or until "the putative defendant in some way becomes 'an accused.'" *Id.* The Court reasoned:

> The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. . . ." On its face, the protection of the Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been "accused" in the course of prosecution. These provisions would seem to afford no protection to those not yet accused, nor would they seem to require the Government to discover, investigate, and accuse any person within any particular period of time. The Amendment would appear to guarantee

---

**6.** The Sixth Amendment Speedy Trial Clause states "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. . . ." U.S. Const. amend. VI.

to a criminal defendant that the Government will move with the dispatch that is appropriate to assure him an early and proper disposition of the charges against him. "The essential ingredient is orderly expedition and not mere speed." *Id.* (alteration in original) (quoting *Smith v. United States*, 360 U.S. 1, 10, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1971)). The Court acknowledged that inordinate delay among arrest, indictment, and trial may impair a defendant's defense, but that "the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense." *Marion*, 404 U.S. at 320, 92 S.Ct. at 462, 30 L.Ed.2d 468. Thus, the Sixth Amendment speedy trial provision does not apply to the time preceding indictment.[7] *Marion*, 404 U.S. at 321, 92 S.Ct. at 463–64, 30 L.Ed.2d 468 ("But we decline to extend the reach of the amendment to the period prior to arrest."). The Court expounded:

Until ... [indictment] occurs, a citizen suffers no restraints on his liberty and is not subject of public accusation: his situation does not compare with that of a defendant who has been arrested and held to answer. Passage of time, whether before or after arrest, may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and

---

**7.** The Sixth Amendment speedy trial provision becomes effective upon "either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." *United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971). In reaching this conclusion, the Court examined the adoption of the language of the Sixth Amendment. *Marion*, 404 U.S. at 313–15, 92 S.Ct. at 460, 30 L.Ed.2d 468. The Court also noted:

Legislative efforts to implement federal and state speedy trial provisions also plainly reveal the view that these guarantees are applicable only after a person has been accused of a crime. The Court has pointed out that 'at the common law and in the absence of special statutes of limitations the mere failure to find an indictment will not operate to discharge the accused from the offense nor will a *nolle prosequi* entered by the Government or the failure of the grand jury to indict.'

*Marion*, 404 U.S. at 316–17, 92 S.Ct. at 461–62, 30 L.Ed.2d 468 (quoting *United States v. Cadarr*, 197 U.S. 475, 478, 25 S.Ct. 487, 49 L.Ed. 842 (1905)).

> otherwise with his ability to defend himself. But this possibility of prejudice at trial is not itself sufficient reason to wrench the Sixth Amendment from its proper context. Possible prejudice is inherent in any delay, however short; it may also weaken the Government's case.

*Marion,* 404 U.S. at 321–22, 92 S.Ct. at 463–64, 30 L.Ed.2d 468 (footnotes omitted).

The Supreme Court envisioned the primary protection against the presumption of prejudice that may arise from extended pre-indictment delay to be the applicable statute of limitations.[8] *Marion,* 404 U.S. at 322, 92 S.Ct. at 464, 30 L.Ed.2d 468 ("As we said in *United States v. Ewell,* [383 U.S. 116, 122, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966)], 'the applicable statute of limitations ... is ... the primary guarantee against bringing overly stale criminal charges.'" (second and third alterations in original)).

Because the appellees in *Marion* based their argument on presumed prejudice inherent in the delay of three years between the crime and the filing of the indictment, the Court noted that it need go no further in its discussion "for the indictment was the first official act designating [the defendants] as accused individuals and that event occurred within the statute of limitations;" mindful, however, that the case was being remanded for further proceeding, the Court added the following pertinent comments:

> [S]ince a criminal trial is the likely consequence of our judgment and since appellees may claim actual prejudice to their defense, it is appropriate to note here that the statute of limitations does not fully define the appellees' rights with respect to the events occurring prior to indictment. *Thus, the Government concedes that the Due Process Clause of the*

---

8. Maryland has no statute of limitations on felonies or penitentiary misdemeanors beyond that imposed by the life of the offender. *Cf. State v. Hamilton,* 14 Md.App. 582, 589 n. 13, 287 A.2d 791, 795 n. 13 (1972) (discussing *United States v. Marion* and the fact that Maryland does not have such a statute of limitations).

*Fifth Amendment*[9] *would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused. Cf. Brady v. Maryland,* 373 U.S. 83, [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963); *Napue v. Illinois,* 360 U.S. 264 [79 S.Ct. 1173, 3 L.Ed.2d 1217] (1959). *However, we need not and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution.* Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution. *To accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case.* It would be unwise at this juncture to attempt to forecast our decision in such cases.

*Marion,* 404 U.S. at 324–25, 92 S.Ct. at 465–66, 30 L.Ed.2d 468 (emphasis added) (internal footnotes omitted). The Court concluded:

[Defendants] rely solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that [defendants] cannot receive a fair trial and to therefore justify the dismissal of the indictment.

*Marion,* 404 U.S. at 325–26, 92 S.Ct. at 466, 30 L.Ed.2d 468.

Five years after *Marion,* the Court amplified its dicta in *Marion* regarding pre-indictment delay in *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).[10]

---

**9.** The Due Process Clause of the Fifth Amendment states: "No person shall be ... deprived of life, liberty, or property, without due process of law...." U.S. Const. amend V.

**10.** Although the Court clarified its opinion in *Marion,* it did not answer all of the questions that *Marion* created. Rather, the Court noted:

In *Lovasco,* which involved approximately an eighteen month delay between when the alleged crime occurred and when the indictment was filed, the Court considered the circumstances in which the U.S. Constitution may require an indictment to be dismissed due to delay in the obtention of the indictment. *Lovasco,* 431 U.S. at 784, 97 S.Ct. at 2046, 52 L.Ed.2d 752. The Court began by reiterating that *Marion* had determined: (1) that the Speedy Trial Clause of the Sixth Amendment does not apply to pre-indictment delay; (2) that statutes of limitations "provide the primary guarantee against bringing overly stale criminal charges"; and, (3) that a statute of limitations does not define fully a defendant's rights prior to indictment and, thus, the Due Process Clause plays a limited role "in protecting against oppressive delay." *Lovasco,* 431 U.S. at 788–89, 97 S.Ct. at 2048, 52 L.Ed.2d 752 (internal quotation marks omitted) (quoting *Marion,* 404 U.S. at 320 n. 8, 324, 322, 92 S.Ct. at 460 n. 8, 465, 464, 30 L.Ed.2d 468).

The Court rejected Lovasco's argument that *Marion* endorses that "due process bars prosecution *whenever* a defendant suffers prejudice as a result of pre-indictment delay." *Lovasco,* 431 U.S. at 789, 97 S.Ct. at 2048, 52 L.Ed.2d 752 (emphasis added). The Court explained that *Marion* "establishes only that proof of actual prejudice makes a due process claim concrete and ripe for adjudication, not that it makes the claim automatically valid." *Lovasco,* 431 U.S. at 789, 97 S.Ct.

> In *Marion* we conceded that we could not determine in the abstract the circumstances in which preaccusation delay would require dismissing prosecutions.... More than five years later, that statement remains true. Indeed, in the intervening years so few defendants have established that they were prejudiced by delay that neither this Court nor any lower court has had a sustained opportunity to consider the constitutional significance of various reasons for delay. We therefore leave to the lower courts, in the first instance, the task of applying the settled principles of due process that we have discussed to the particular circumstances of individual cases. We simply hold that in this case the lower courts erred in dismissing the indictment.
>
> *United States v. Lovasco,* 431 U.S. 783, 796–97, 97 S.Ct. 2044, 2052, 52 L.Ed.2d 752 (1977) (footnote omitted) (citation omitted).

at 2048, 52 L.Ed.2d 752. (referring to *Marion,* 404 U.S. at 324–25, 322, 92 S.Ct. at 464–65, 30 L.Ed.2d 468).

 The Court reiterated a two element test for evaluating pre-indictment delay: *"Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay *as well as* the prejudice to the accused." *Lovasco,* 431 U.S. at 790, 97 S.Ct. at 2048–49, 52 L.Ed.2d 752 (emphasis added). Rejecting the notion that there was a constitutional right to have charges filed with any expediency,[11] the Court provided some insight into evaluating the reasons for the delay in the context of the Due Process Clause:

[T]he Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free, in defining "due process," to impose on law enforcement officials our "personal and private notions" of fairness and to "disregard the limits that bind judges in their judicial function." ... Our task is more circumscribed. We are to determine only whether the action

---

11. In this regard, the Court also noted that there is no constitutional right to be arrested:

The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction. *Lovasco,* 431 U.S. at 792 n. 13, 97 S.Ct. at 2050 n. 13, 52 L.Ed.2d 752 (internal quotation marks omitted) (quoting *Marion,* 404 U.S. at 325 n. 18, 92 S.Ct. at 465, 30 L.Ed.2d 468). For further explanation of the "deleterious effects" of requiring prosecutors to indict before having probable cause or to file charges as soon as probable cause exists, "but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt," or even once there is enough evidence to support reasonable doubt, see *Lovasco,* 431 U.S. at 790–95, 97 S.Ct. at 2049, 52 L.Ed.2d 752; see also *Smallwood v. State,* 51 Md.App. 463, 465–66, 443 A.2d 1003, 1005 (1982).

complained of—here, compelling [defendant] to stand trial after the Government delayed indictment to investigate further—violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," ... and which define "the community's sense of fair play and decency."

*Lovasco,* 431 U.S. at 790, 97 S.Ct. at 2048–49, 52 L.Ed.2d 752 (citations omitted). The Court then reiterated, as it had pronounced in *Marion,* that "investigative delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused.' " *Lovasco,* 431 U.S. at 795, 97 S.Ct. at 2051, 52 L.Ed.2d 752 (quoting *Marion,* 404 U.S. at 324, 92 S.Ct. at 465, 30 L.Ed.2d 468). The Court stated that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Lovasco,* 431 U.S. at 795–96, 97 S.Ct. at 2051–52, 52 L.Ed.2d 752. In so concluding, the Court reasoned:

Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of 'orderly expedition' to that of 'mere speed,'.... This the Due Process Clause does not require.

*Lovasco,* 431 U.S. at 795–96, 97 S.Ct. at 2051, 52 L.Ed.2d 752 (citations omitted). Therefore, to establish a federal due process violation, a defendant must show that the pre-indictment delay caused him actual, substantial prejudice and that the delay was the product of a deliberate act by the government designed to gain a tactical advantage. The Court again stopped short of "determining in the abstract the circumstances in which preaccusation delay would require dismissing prosecutions." [12] *Lovasco,* 431 U.S. at 796, 97 S.Ct. at 2052, 52

---

**12.** The Court, however, catalogued in a footnote some noninvestigative reasons for delay. *Lovasco,* 431 U.S. at 797 n. 19, 97 S.Ct. at 2052 n.

L.Ed.2d 752 (citation omitted); *see also supra* note 10.

Since *Marion* and *Lovasco,* the Court merely has reiterated its test for determining a due process violation with regard to pre-indictment delay. In *United States v. Gouveia,* 467 U.S. 180, 192, 104 S.Ct. 2292, 2299, 81 L.Ed.2d 146 (1984), the Court stated that "the Fifth Amendment requires the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him prejudice in presenting the defense." Four years later, in *Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988), the Court noted that in *Marion* it had required actual prejudice to the defense and a showing that the Government intentionally delayed indictment to gain some tactical advantage or to harass.

### B. *What have the Lower Federal Courts Said?*

Petitioner would have us believe that the U.S. Supreme Court has not established a two element test for pre-indictment delay, and thus the Court of Special Appeals incorrectly, initially in *State v. Hamilton,* 14 Md.App. 582, 287 A.2d 791 (1972), relied on *Marion* in formulating a two part test with two mandatory requirements, rather than a test that balances the two elements against each other. Petitioner argues that the proper test is a balancing test—balancing the prejudice to the defendant caused by the delay against the State's reasons for the delay. Petitioner finds succor for his view in the opinions of a minority of U.S. Circuit Courts of Appeal. Petitioner believes that it is this minority view that correctly interprets the U.S. Supreme Court's decisions in *Marion* and *Lovasco.*

In making his argument, Petitioner directs our attention to the following from a law review article:

---

19, 52 L.Ed.2d 752 (quoting Amsterdam, *Speedy Criminal Trial: Rights and Remedies,* 27 Stan L.Rev. 525, 527–28 (1875)).

In *United States v. Marion,* the Supreme Court accepted in dictum the government's concession that intentional prosecutorial delay transgresses due process strictures when the delay is undertaken for the purpose of gaining tactical advantage over a defendant who thereby suffers prejudice. The precise language of the portion of the opinion discussing intentional tactical delay indicates that the Court was not describing the standard for due process violations in this context. Because the appellee had claimed neither actual prejudice nor intentional delay, the Court expressly declined to elaborate a standard. Instead, it provided an illustration of one egregious situation that such a standard would likely proscribe. *In other words, the Court was establishing the due process ceiling to the problem. Several circuits, however, have fixed the ceiling and the floor in identical locations, requiring both actual prejudice and intentional tactical delay as the minimum showing for a due process violation.*

Petitioner's Br. at 21 (alterations in original) (quoting Phyllis Goldfarb, *When Judges Abandon Analogy: The Problem of Delay in Commencing Criminal Prosecutions,* 31 WM. & MARY L.REV. 622–23 (1990)).

Petitioner primarily relies on Fourth and Ninth Circuit cases,[13] which clearly represent the minority view adopting a balancing test. The Ninth Circuit has explained the appropriate balancing test as the following:

Pre-indictment delay that results from negligence or worse may violate due process. *See United States v. Swacker,* 628 F.2d 1250, 1254 n. 5 (9th Cir.1980).... Whether due process has been violated is decided under a balancing test and 'if *mere negligent* conduct by the prosecutors is asserted, then obviously the delay and/or prejudice suffered by the defendant will have to be greater.' *United States v. Moran,* 759

---

**13.** Petitioner also, but improperly so, relies on a Seventh Circuit Case. *See infra* note 17. In addition, he cites to a U.S. District Court case, *United States v. Sabath,* 990 F.Supp. 1007, 1016 (N.D.Ill. 1998), in which the court characterized *Lovasco* as providing a balancing test.

F.2d 777, 782 (9th Cir.1985) (as amended). The defendant must show actual prejudice from the delay, and the court must balance the length of the delay with the reasons for the delay.

*United States v. Ross,* 123 F.3d 1181, 1184–85 (9th Cir.1997) (emphasis added), *cert. denied,* 522 U.S. 1066, 118 S.Ct. 733, 139 L.Ed.2d 670 (1998).

Similarly, the Fourth Circuit, in *Howell v. Barker,* 904 F.2d 889 (4th Cir.1990), *cert. denied,* 498 U.S. 1016, 111 S.Ct. 590, 112 L.Ed.2d 595, stated:

Applying these principles of due process to the case at hand, we cannot agree with the position taken by the State of North Carolina and those other circuits which have held that a defendant, in addition to establishing prejudice, must also prove improper prosecutorial motive before securing a due process violation. Taking this position to its logical conclusion would mean that no matter how egregious the prejudice to a defendant, and no matter how long the pre-indictment delay, if a defendant cannot prove improper prosecutorial motive, then no due process violation has occurred. This conclusion on its face, would violate fundamental conceptions of justice, as well as the community's sense of fair play. Moreover, this conclusion does not contemplate the difficulty defendants either have encountered or will encounter in attempting to prove improper prosecutorial motive.

*Barker,* 904 F.2d at 895. The Fourth Circuit concluded that the "better position" is

to put the burden on the defendant to prove actual prejudice. Assuming the defendant can establish actual prejudice, then the court must *balance* the defendant's prejudice against the government's justification for delay.... 'The basic inquiry then becomes whether the government's action in prosecuting after substantial delay violates fundamental conceptions of justice or the community's sense of fair play and decency.'

*Id.* (emphasis added) (citations omitted) (internal quotation marks omitted).

We observe, however, that the Fourth Circuit, in *Jones v. Angelone, Dir. Dept. of Corr., Virginia,* 94 F.3d 900 (4th Cir.1996), has cast some doubt on the continuing vitality of *Howell v. Barker, supra.* In *Jones,* the court was presented with an argument calling for the overruling of *Howell* based on the theory that the balancing test employed in *Howell* was "irreconcilable" with a number of Supreme Court cases, including *United States v. Gouveia, supra,* in the which the Court explained that "to establish a due process violation based upon pre-indictment delay, a defendant must show not only actual prejudice, but also that the government deliberately caused the delay for tactical gain." *Jones,* 94 F.3d at 904–05 (citations omitted). The court acknowledged that every other circuit, other than the Ninth Circuit, had, on the authority of *Gouveia, Marion, Lovasco,* and *Youngblood,* adopted the two part test for evaluating pre-indictment delay.

The Fourth Circuit explained, however, that, even under the two part test, Jones could not demonstrate a due process violation as he had not presented any evidence the government delayed indictment to gain a tactical advantage or acted in any other way in bad faith. *Jones,* 94 F.3d at 905. The panel of the Fourth Circuit, in *Jones,* in any event, recognized that it could not overrule the decision of the panel that decided *Howell;* that task being left to the court sitting en banc.[14] *Id.*

---

**14.** The Fourth Circuit continued its analysis by first determining that the defendant did not demonstrate actual and substantial prejudice due to the pre-indictment delay, a requirement in both the balancing and two part tests. *Jones v. Angelone, Dir., Dept. of Corr., Virginia,* 94 F.3d 900, 907–09 (4th Cir.1996). The court then carried out the reasoning of *Howell v. Barker* and stated:

Even if [defendant] had established that he was actually and substantially prejudiced by the pre-indictment delay, he still would not be entitled to relief under the Due Process Clause, because he has also failed to satisfy *Howell*'s second requirement that, balancing the prejudice to the defendant against the state's reasons for the delay, the delay 'violated fundamental conceptions of justice or the community's sense of fair play and decency.'

*Jones,* 94 F.3d at 910 (quoting *Howell,* 904 F.2d at 895).

Indeed, the majority of the Federal Circuits interpret *Marion* and *Lovasco* differently than Petitioner and the Fourth and Ninth Circuits.[15] The majority of the circuits, expressly citing *Marion* and *Lovasco*, clearly employ a two element due process test for evaluating pre-indictment delay, requiring a showing of actual prejudice to the defense as well as a showing that the delay was an intentional device employed by the government to gain a tactical advantage.

For instance, the U.S. Court of Appeals for the First Circuit in *United States v. Kenrick*, 221 F.3d 19, 33 (1st Cir.2000), *cert. denied*, 531 U.S. 961, 121 S.Ct. 387, 148 L.Ed.2d 299, stated that to succeed on a due process claim with regard to pre-indictment delay the defendant must show "that the pre-indictment delay caused him actual, substantial prejudice [and] that the prosecution orchestrated the delay to gain a tactical advantage over him." *Id.* (internal quotation marks omitted) (alteration in original) (quoting *United States v. Stokes*, 124

---

**15.** Justice White's dissenting opinion in the Court's denial of certiorari in *Hoo v. United States*, 484 U.S. 1035, 108 S.Ct. 742, 98 L.Ed.2d 777 (1988), *see infra* p. 636, exemplifies the discrepancy among the circuits regarding the proper test for pre-indictment delay. Justice White stated:

The issue presented by this petition for certiorari is what is the correct test for determining if prosecutorial pre-indictment delay amounts to a violation of the Due Process Clause of the Fifth Amendment.... The Second Circuit held that there was no due process violation because petitioner 'made no showing of an improper prosecutorial motive.' ... Other circuits [(the First, Third, Tenth, and Eleventh)] have similarly required a showing of prosecutorial misconduct designed to obtain a tactical advantage over the defendant or to advance some other impermissible purpose ... to establish a due process violation.... Two Circuits [(the Fourth and the Ninth)], however, have concluded that intentional misconduct is not the sine qua non for a due process violation from prosecutorial pre-indictment delay, and instead they hold that the proper inquiry is to balance the prejudice to the defendant against the Government's justification for delay.... Exemplifying the significant disagreement in the lower courts over the proper test, panels in the Fifth and Seventh Circuits have acknowledge conflicts between decisions from their own Circuits on this issue....

*Id.* (citations omitted); *see also United States v. Crouch*, 84 F.3d 1497, 1512 n. 13 (5th Cir.1996), *cert. denied*, 519 U.S. 1076, 117 S.Ct. 736, 136 L.Ed.2d 676 (1997).

F.3d 39, 47 (1st Cir.1997)) (citing *Marion,* 404 U.S. at 324, 92 S.Ct. 455, 30 L.Ed.2d 468).

The Second Circuit, presented with a due process claim in the context of a four year delay between the alleged crime and the indictment, stated that "[a] defendant bears the 'heavy burden' of proving *both* that he suffered actual prejudice because of the alleged pre-indictment delay *and* that such delay was a course intentionally pursued by the government for an improper purpose." *United States v. Cornielle,* 171 F.3d 748, 752 (2d Cir.1999) (emphasis added) (citing *United States v. Scarpa,* 913 F.2d 993, 1014 (2d Cir.1990), cert. denied, 498 U.S. 816, 111 S.Ct. 57, 112 L.Ed.2d 32; *United States v. Hoo,* 825 F.2d 667, 671 (2d Cir.1987), *cert. denied,* 484 U.S. 1035, 108 S.Ct. 742, 98 L.Ed.2d 777 (1988)) (discussing *Marion,* 404 U.S. at 324, 92 S.Ct. 455, 30 L.Ed.2d 468; *Lovasco,* 431 U.S. at 795, 97 S.Ct. 2044, 52 L.Ed.2d 752),.

The Third, Sixth, Eight, Tenth, and Eleventh Circuits identify and employ the same two part test as succinctly as the Second Circuit. *See United States v. Ismaili,* 828 F.2d 153, 167–68 (3rd Cir.1987) (citing *Marion,* 404 U.S. at 325, 92 S.Ct. 455, 30 L.Ed.2d 468; *Lovasco,* 431 U.S. at 789–90, 97 S.Ct. 2044, 52 L.Ed.2d 752), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988); *United States v. Rogers,* 118 F.3d 466, 476 (6th Cir.1997) (quoting *United States v. Brown,* 959 F.2d 63, 66 (6th Cir.1992)) (citing *United States v. Atisha,* 804 F.2d 920, 928 (6th Cir.1986); *Lovasco,* 431 U.S. at 786, 97 S.Ct. 2044, 52 L.Ed.2d 752), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987); *United States v. Sturdy,* 207 F.3d 448, 451–52 (8th Cir.2000) (citing *United States v. Bartlett,* 794 F.2d 1285, 1289 (8th Cir.1986), *cert. denied,* 479 U.S. 934, 107 S.Ct. 409, 93 L.Ed.2d 361); *United States v. Trammell,* 133 F.3d 1343, 1351 (10th Cir.1998) (citing *Lovasco,* 431 U.S. at 789, 97 S.Ct. 2044, 52 L.Ed.2d 752; *United States v. Johnson,* 120 F.3d 1107, 1110 (10th Cir.1997)); *United States v. Foxman,* 87 F.3d 1220, 1222 (11th Cir.1996) (citing *Marion,* 404 U.S. at 323–27, 92 S.Ct. 455, 30 L.Ed.2d 468; *Lovasco,* 431 U.S. at 788–91, 97 S.Ct. 2044, 52 L.Ed.2d 752).

The Fifth Circuit grappled at somewhat greater length than its sister circuits with the balancing test/two part test choice, but settled on the two part test. In *United States v. Crouch,* 84 F.3d 1497 (5th Cir.1996) (en banc), *cert. denied,* 519 U.S. 1076, 117 S.Ct. 736, 136 L.Ed.2d 676 (1997), the Fifth Circuit noted that in at least two prior opinions it had discussed a test for pre-indictment delay that depended upon "the due process balancing between the extent of the actual prejudice and the governmental interests at stake." *Crouch,* 84 F.3d at 1509 (internal quotation marks omitted) (quoting *United States v. Brand,* 556 F.2d 1312, 1317 n. 17 (5th Cir.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1237, 55 L.Ed.2d 763 (1978)). The court then criticized this balancing test and stated that, although neither *"Marion* nor *Lovasco* is crystal clear on this issue, and each opinion contains some language that can give comfort to either view, ... the better reading of these opinions is that the Supreme Court ... has refused to recognize a claim of pre-indictment delay absent some bad faith or improper purpose on the part of the prosecution." *Crouch,* 84 F.3d at 1510.

The Fifth Circuit concluded that the only "due process violation specifically recognized is where the delay not only 'caused substantial prejudice,' but also 'was an intentional device to gain tactical advantage.'" *Id.* (quoting *Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468).[16] The Seventh Circuit underwent a similar analytical metamorphosis with like result.[17]

---

**16.** In reaching this conclusion, the Fifth Circuit noted, inter alia, that neither *Marion* nor *Lovasco* mentions any 'balancing' or 'weighing' of the extent of the prejudice against the relative merit of the reasons for the delay. Indeed, the closest thing to a reference to balancing is *Marion*'s statement that limitations statutes 'represent legislative assessments of *relative interests* of the State and the defendant. *Crouch,* 84 F.3d at 1510 (alteration in original) (quoting *Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468)

**17.** Petitioner incorrectly employs the Seventh Circuit case of *United States v. Sowa,* 34 F.3d 447 (7th Cir.1994) as support for a due process balancing test. It is clear that the Seventh Circuit in *Sowa* employed a two part analysis rather than a balancing test. *Cf. Crouch,* 84 F.3d at

The majority of U.S. Courts of Appeals have embraced the two part test because the two part test, in their view, adequately protects due process, while the balancing test falls short of the mark. The Fifth Circuit stated the inherent problems with the balancing test:

> [W]hat [the balancing test] seeks to do is to compare the incomparable. The items to be placed on either side of the balance (imprecise in themselves) are wholly different from each other and have no possible common denominator that

---

1512 & n. 14 (explaining *Sowa* as a case in which the Seventh Circuit uses the two part test rather than the balancing test). In *Sowa*, the Seventh Circuit stated:

> To establish that a pre-indictment delay violated due process, Sowa must prove that the delay caused actual and substantial prejudice to his fair trial rights, and there must be a showing that the government delayed indictment to gain a tactical advantage or some other impermissible reason. . . .
>
> Sowa's claim, however, fails to meet the requirements of the second prong. With respect to the government's delay, due process is only implicated if the government purposely delayed the indictment to take advantage, tactically, of the prejudice or otherwise acted in bad faith.

*Sowa*, 34 F.3d at 450; *see also Aleman v. The Honorable Judges of the Circuit Court of Cook County*, 138 F.3d 302, 309 (7th Cir.1998) (stating that to demonstrate a pre-indictment delay violation, the defendant must show actual delay and the government must demonstrate justification for the delay, "which the court will balance against the prejudice"), *cert. denied*, —— U.S. ——, 121 S.Ct. 1097, 148 L.Ed.2d 969 (2001). It is likely that Petitioner believes that *Sowa* supports a balancing test because the Seventh Circuit provided that once the defendant proves actual prejudice the government has to supply its reasons for delay, and the "[t]he reasons are then balanced against the defendant's prejudice to determine whether the defendant has been denied due process." *Sowa*, 34 F.3d at 451. This form of balancing, however, does not go as far as those courts that clearly adopt a balancing test, *see supra* pp. 632–35. *Sowa* has been criticized as ignoring what the Supreme Court intended in requiring proof of bad faith, that there must be a direct connection between the government's reason for the delay and the prejudice. In other words, prejudice that is an incidental effect of delay is insufficient for a due process violation. *See* Peter J. Henning, *Prosecutorial Misconduct and Constitutional Remedies*, 77 WASH. U.L.Q. 713, 778 (1999) (noting some courts, such as the Seventh Circuit in *Sowa*, "have ignored the requirement of actual bad faith adopted in *Lovasco* and *Marion*, instead substituting a broader examination of the government's reasons for the delay that is more akin to the balancing test").

would allow determination of which 'weighs' the most. Not only is there no scale or conversion table to tell us whether eighty percent of minimally adequate prosecutorial and investigative staffing is outweighed by a low-medium of actual prejudice, there are no recognized general standards or principles to aid us in making that determination and virtually no body of precedent or historic practice to look to for guidance. Inevitably, then, a 'length of the Chancellor's foot' sort of resolution will ensue and judges will necessarily define due process in each such weighing by their own 'personal and private notions of fairness,' contrary to the admonition of *Lovasco*.

*Crouch*, 84 F.3d at 1512.[18] The two part test, on the other hand, does not require such a comparison "between the government's culpability and the effect on trial." Peter J. Henning, *Prosecutorial Misconduct and Constitutional Remedies*, 77 Wash. U.L.Q. 713, 779 (1999). Rather,

[a] defendant must first show that the prosecutorial misconduct had a prejudicial effect on the outcome of the proceeding.... A defendant must then demonstrate that the prosecutor intended, through the misuse or destruction of evidence, to undermine the ability of the defense to establish its case. There is no room for negligence in a due process analysis that relies on governmental bad faith. The Supreme Court has been consistent throughout its decisions reviewing knowing use of perjured testimony, destruction of exculpatory evidence, and investigatory delay, in holding that defendant must furnish proof of actual

---

**18.** One author also commented on the difficulty with using a balancing test:

Any test that simply compares prejudice to the defendant with the prosecutor's reason for a delay runs the risk of holding the government responsible for the loss of testimony or items about which it had no knowledge, and more importantly, no intention of removing from the body of evidence available at trial. If a defendant could show some harm from the government's decision to postpone initiating a prosecution, then the balancing test would give courts the authority to assess the government's reasons for delay an to decide whether they met some unspecified criterion of acceptability.

Henning, *supra*, at 779.

prosecutorial intent to harm, not just that government negligence resulted in prejudice.

*Id.*

### C. Petitioner's Sixth Amendment– Speedy Trial Justification.

In addition to seeking to persuade us to enlist with the minority of federal circuits on this proposition, Petitioner relies on Sixth Amendment speedy trial cases in support of adopting a balancing test.[19] As noted, *supra*, the Supreme Court has made it clear that the Sixth Amendment does not apply to pre-indictment delay. Petitioner quotes *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972),[20] a Sixth Amendment speedy trial case, to demonstrate that the same concerns exist with providing a speedy trial as with pre-indictment delay, thus, as is the case with speedy trial violations, a defendant's right to a fair trial must be protected in the case of pre-indictment delay by a balancing test. Petitioner contends:

As the Supreme Court noted [in] *Barker v. Wingo*, *supra*, the harm threatened by untimely prosecution includes "oppressive pretrial incarceration," "anxiety and concern of the

---

**19.** In determining Sixth Amendment speedy trial violations, the Supreme Court employs a balancing test, which takes into consideration length of delay, the reason for delay, the defendant's assertion of his right, and prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972); *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 2690, 120 L.Ed.2d 520 (1992).

**20.** Petitioner also relies on *Doggett v. United States*, 505 U.S. 647, 112 S.Ct. 2686, 120 L.E.2d 520 (1992), a Sixth Amendment speedy trial case. Petitioner's Br. at 22–23. This case does not apply for the same reasons that *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), *infra*, does not apply, regardless of the fact that the defendant in *Doggett* was unaware that he had been charged for an offense until his arrest eight years later. *See also Aleman*, 138 F.3d at 309–10 (rejecting a "strained analogy" between pre-indictment delay and post-indictment delay); *United States v. Foxman*, 87 F.3d 1220, 1222 (11 th Cir.1996) (explaining that *Doggett* did not alter the due process analysis with regards to pre-indictment delay) (citing *United States v. Bischel*, 61 F.3d 1429, 1436 (9th Cir.1995))

accused," and "the possibility that the [accused's] defense will be impaired" by dimming memories and the loss of exculpatory evidence. Of these forms of prejudice, "the most serious is the last because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." [*Wingo,*] 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. That same concern with the ability to present a defense is of as much, if not more, of a concern when the latter-to-be accused is not aware during the period of the delay of the necessity to preserve memories and evidence.

Petitioner's Br. at 22.

The Petitioner's attempted analogy between *Wingo* and the present case also misapprehends the Court's opinion in *Wingo.* The *Wingo* factors, *supra,* are but some of the factors to be considered when considering prejudice to the defendant, which is itself a factor to be weighed against three other considerations, *see supra* note 19, and not necessarily something upon which a Sixth Amendment violation of the Speedy Trial Clause could stand alone. *Wingo,* 407 U.S. at 533–35, 92 S.Ct. at 2193–95, 33 L.Ed.2d 101. As one author notes, with regard to the fallacy of such an analogy:

The Speedy Trial Clause and the due process analysis both rely on temporal delay as a trigger for protection. It is easy to view them as interchangeable, and the Court's consideration of the government's reasons for the delay for a speedy trial violation was reminiscent of the bad faith element of the due process analysis. A closer look, however, shows that the two rights are fundamentally different. The *Barker v. Wingo* test balanced the government's reason for a delay against the other factors, including the presumption of prejudice, to determine a constitutional violation. *Lovasco* and *Marion,* did not adopt a balancing test.... Unlike the speedy trial right, which arises from a specific constitutional protection requiring the government to act within some general time constraint, due process protects against prosecutorial misconduct related to the use or destruction of evidence. Delay alone is not a due process

violation, even if the government's reasons for not acting expeditiously were ill-considered or reflected a slovenly approach to the investigation.

Henning, *supra*, at 777. It is clear then that, unlike in a Speedy Trial Clause balancing test, the element of prosecutorial misconduct, which amounts to more than mere negligence,[21] is a necessary component to a due process violation as that is what due process protects against. It follows that for

---

**21.** It is clear from *Marion* and *Lovasco* that something more than mere negligence is required to amount to an intentional delay to gain a tactical advantage, particularly in light of the Court's noting in *Marion* that the Government conceded that an intentional tactical delay by the Government would violate the Due Process Clause. *See United States v. Rogers,* 118 F.3d 466, 476 (6th Cir.1997) (explaining that the second part of the test for unconstitutional pre-indictment delay is "that the delay was an intentional device by the government to gain a tactical advantage" (internal quotation marks omitted) (citation omitted)). *Cf.* Henning, *supra*, at 776 ("The Supreme Court has been consistent throughout its decisions reviewing knowing use of perjured testimony, destruction of exculpatory evidence, and investigative delay, in holding that a defendant must furnish proof of *actual* prosecutorial intent to harm, not just that the government negligence resulted in prejudice" (emphasis added)). Yet, whether the U.S. Supreme Court intended that a demonstration of recklessness may be sufficient is unclear. *See Lovasco,* 431 U.S. at 795 n. 17, 97 S.Ct. at 2051 n. 17, 52 L.Ed.2d 752. The Court noted in a footnote:

In *Marion* we noted with approval that the Government conceded that a "tactical" delay would violate the Due Process Clause. The Government renews that concession here . . . and expands it somewhat by saying: "A due process violation might also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense." . . . As the Government notes, however, there is no evidence of recklessness here.

*Id.* (citations omitted); *see also supra* note 17 (discussing the Seventh Circuit case of *Sowa*). *But see Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988) (discussing *Marion* as a case in which the Court "stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government" when the Court stated that "[n]o actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them." (quoting *Marion,* 404 U.S. at 325, 92 S.Ct. 455, 466, 30 L.Ed.2d 468) (internal quotation marks omitted) (alteration in original)).

there to be a due process violation for pre-indictment delay, there must be both actual prejudice and government delay to gain a tactical advantage.

### D. Maryland Cases Regarding Pre-indictment Delay

As noted, *supra*, the Court of Special Appeals has adopted and employed the two element test over the balancing test for evaluating due process claims with regard to pre-indictment delay. *See Smallwood*, 51 Md.App. 463, 443 A.2d 1003; *Dorsey v. State*, 34 Md.App. 525, 368 A.2d 1036 (1977), *cert. denied*, 280 Md. 730; *Blake v. State*, 15 Md.App. 674, 292 A.2d 780 (1972); *State v. Hamilton*, 14 Md.App. 582, 589, 287 A.2d 791, 795 (1972). The issue is a matter of first impression for this Court. We determine that the Court of Special Appeals correctly chose and applied the two element test of *Marion* and *Lovasco*.

█ As noted *supra*, Maryland has no statute prescribing a time limit for seeking an indictment for felonies and peneteniary misdemeanors. We look to the common law for guidance as required by Article 5 of the Declaration of Rights, Constitution of Maryland, which mandates "[t]hat the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of the Law, and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six." As the Court of Special Appeals correctly noted in *Smallwood*, "[a]t common law, criminal proceedings may be instituted at any time during the life of an offender." *Smallwood*, 51 Md.App. at 468, 443 A.2d at 1006 (internal quotation marks omitted) (quoting Hochheimer, LAW OF CRIMES AND CRIMINAL PROCEDURE § 87 (1897); 1 Wharton, CRIMINAL LAW § 90 (14th ed. (1978)). Therefore, assuming that the indictment against Petitioner was otherwise validly brought, the indictment does not fail merely because it was brought fifteen years after the crime was committed. *Cf. Smallwood*, 51 Md.App. at 468, 443 A.2d at 1006.

We now turn to the Maryland Constitution to determine whether there is any barrier to be found regarding Petition-

er's "delayed" prosecution. Article 24 of the Declaration of Rights to the Maryland Constitution, addressing due process, provides:

> [n]o man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

We long ago determined that the phrase, "the Law of the land," "mean[s] the same thing" as "due process of law" as used in the Fourteenth Amendment of the U.S. Constitution.[22] *Baltimore Belt R.R. v. Baltzell,* 75 Md. 94, 99, 23 A. 74, 74 (1891); *see e.g. Department of Transportation v. Armacost,* 299 Md. 392, 415–16, 474 A.2d 191, 202–03 (1984) ("The due process clause of Article 24 of the Maryland Declaration of Rights and the fourteenth amendment to the federal constitution have the same meaning; and we have said that Supreme Court interpretations of the federal provision are authority for the interpretation of Article 24." (Citing *Pitsenberger v. Pitsenberger,* 287 Md. 20, 27, 410 A.2d 1052 (1980), *appeal dismissed,* 449 U.S. 807, 101 S.Ct. 52, 66 L.Ed.2d 10 (1980))); *Pitsenberger,* 287 Md. at 27, 410 A.2d at 1056 (same) (citing *Barry Properties v. Fick Bros.,* 277 Md. 15, 22, 353 A.2d 222 (1976); *Bureau of Mines v. George's Creek,* 272 Md. 143, 156, 321 A.2d 748 (1974)).

■ Although *Lovasco* and *Marion* were decided on the basis of the Due Process Clause of the Fifth Amendment to the U.S. Constitution, as the Court of Special Appeals stated in *Smallwood,*

> we perceive no reason in this case to address whatever distinction there may be between the due process clause of

---

**22.** The Fourteenth Amendment of the U.S. Constitution states in pertinent part;

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny any person within its jurisdiction the equal protection of the laws.

the Fifth Amendment and that of the Fourteenth Amendment. We shall in the matter *sub judice* treat "due process," whether in the Fifth or Fourteenth Amendment, as being equated to the "Law of the land."

*Smallwood*, 51 Md.App. at 471, 443 A.2d at 1007–08. Therefore, following *Marion* and *Lovasco*, and the majority of the U.S. Courts of Appeal employing the two part test to assess a due process violation,[23] those who assert a pre-indictment delay must prove (1) actual prejudice [24] to the accused *and* (2) that the delay was purposefully made by the State to gain a tactical advantage over the accused.[25] *See Smallwood*, 51 Md.App. at 472, 443 A.2d at 1008.

---

**23.** Many State courts have also employed the two part test rather than the balancing test. *See, e.g., Alabama v. Sealy*, 728 So.2d 657, 661–62 (Crim.App.1997); *Arizona v. Williams*, 183 Ariz. 368, 904 P.2d 437, 448 (1995) (en banc); *Scott v. Arkansas*, 263 Ark. 669, 566 S.W.2d 737, 740 (1978); *People v. Small*, 631 P.2d 148, 157 (Colo.1981), *cert. denied*, 454 U.S. 1101, 102 S.Ct. 678, 70 L.Ed.2d 644; *United States v. Day*, 697 A.2d 31, 33–35 (D.C.App.1997); *Idaho v. Murphy*, 99 Idaho 511, 584 P.2d 1236, 1239 (1978); *Iowa v. Cuevas*, 282 N.W.2d 74, 77 (1979); *Kansas v. Smallwood*, 264 Kan. 69, 955 P.2d 1209, 1218 (1998); *Kirk v. Commonwealth of Kentucky*, 6 S.W.3d 823, 826–27 (1999); *De La Beckwith v. Mississippi*, 707 So.2d 547, 568 (1997), *cert. denied*, 525 U.S. 880, 119 S.Ct. 187, 142 L.Ed.2d 153 (1998); *Missouri v. Scott*, 621 S.W.2d 915, 917–19 (1981); *Nevada v. Autry*, 103 Nev. 552, 746 P.2d 637, 641 (1987); *Gonzales v. New Mexico*, 111 N.M. 363, 805 P.2d 630, 632 (1991); *Commonwealth of Pennsylvania v. Daniels*, 480 Pa. 340, 390 A.2d 172 (1978); *Rhode Island v. Vanasse*, 593 A.2d 58, 63–66 (1991); *Vernier v. Wyoming*, 909 P.2d 1344, 1349 (1996). *But see, e.g., People v. Lawson*, 67 Ill.2d 449, 10 Ill.Dec. 478, 367 N.E.2d 1244 (1977); *Montana v. Wright*, 17 P.3d 982, 986 (2000); *New Hampshire v. Adams*, 133 N.H. 818, 585 A.2d 853 (1991).

**24.** In *Smallwood*, as noted *supra*, the Court of Special Appeals stated:

It is the required showing of *actual prejudice* that distinguishes Sixth Amendment speedy trial matters from the Fourteenth Amendment "Due Process" and Article 24 "Law of the land" cases. The distinction is not a matter of mere semantics; it is crucial because in Sixth Amendment cases, "prejudice" may be presumed from delay, but pre-indictment delay—"Due Process Law of the land" matters—prejudice may not be presumed but must be proven.

*Smallwood*, 51 Md.App. at 472, 443 A.2d at 1008 (citing *United States v. Henry*, 615 F.2d 1223 (9th Cir.1980)).

**25.** In a Court of Special Appeals opinion penned after *Marion*, but before *Lovasco*, the court provided a test for a due process violation

*E. Application of the Two Part Test to the Present Case*

We now must determine whether the Court of Special Appeals correctly applied the two part test to the facts of the present case. The Court of Special Appeals stated:

> In the case *sub judice,* there was no showing that the delay was an intentional, calculated tactic utilized by the State to obtain an advantage over appellant at trial. The police initially investigated the crimes, interviewed witnesses and suspects, and pursued leads. Yet, the police did not obtain information necessary to move forward on the case until they re-interviewed Michael Grimes 15 years after the crimes, and obtained his cooperation. The court committed no clear error in its denial of appellant's claim of unconstitutional pre-indictment delay.

We agree with the Court of Special Appeals.

In this instance, as George Washington once wrote to Thomas Jefferson, "[d]elay is preferable to error." *Smallwood,* 51 Md.App. at 467, 443 A.2d at 1005 (quoting Thomas Jefferson in a letter to George Washington dated 16 May 1792). Even though Petitioner concededly suffered actual prejudice due to the loss of witnesses and other suspects, *supra* p. 619,[26] no evidence was adduced that the State pur-

---

with regard to pre-indictment delay that may not be considered as forceful as the one *Lovasco* put forth or the one that we recognize here:

[A]bsent a showing of actual prejudice, compared to possible prejudice, "the applicable statute of limitations ... is usually considered the primary guarantee against bringing overly stale criminal charges." ... Where a defendant can demonstrate actual prejudice, however, in circumstances where the delay between the occurrence of the criminal offense and the date of arrest or indictment is unduly long and the actions of the State in delaying were unreasonable, deliberate and oppressive, the due process clause would demand a dismissal of the indictment.

*Dorsey v. State,* 34 Md.App. 525, 537–38, 368 A.2d 1036, 1044 (1977) (first alteration in original) (citations omitted) (discussing *United States v. Marion*).

**26.** The trial court judge at the motions hearing on 16 September 1998 stated:

posefully delayed Petitioner's arrest to gain a tactical advantage over him. The investigation by Detective Capel conducted immediately following the crimes included: interviewing witnesses, including three eyewitnesses to the attempted robbery; compiling and showing to witnesses a photographic lineup that included Petitioner and the other three suspects; submitting hairs from the recovered red bandana for comparison with hair samples from Chad and Mike Grimes; and, interviewing the four initial suspects.

Additionally, although the investigation immediately following the crimes apparently produced probable cause to believe that Clark, the Grimes brothers, and Stallings were involved, and Detective Capel prepared an Application for Statement of Charges for each of the four suspects, as the trial court found, it also was believed, with reason, that the evidence discovered at that time may have been insufficient to prosecute them successfully.[27] As noted *supra*, in *Lovasco*, the U.S. Supreme Court explained that the Fifth Amendment Due Process Clause does not require a prosecutor to seek an indictment the moment he or she has probable cause. The Third Circuit noted, in *United States v. Ismaili:*

> As the Supreme Court instructs, "it should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond

---

The problem in this case—and the State concedes that there is prejudice with regard to the Defense in this case and, likewise, the Court believes that because of the—some witnesses are deceased at this point that there is some prejudice that has been attached to the State, because they are in a difficult position as well.

**27.** Although the trial judge ultimately employed a balancing test, *see supra* pp. 619–20, he did note:

The testimony is clear that the State, back at the time of the crimes occurred, although they had some probable cause to believe that this Defendant and others were responsible for the robbery and the crimes, they did not have sufficient evidence with which to bring indictments and to proceed before a jury or judge to present evidence which they believe could convict beyond a reasonable doubt and to a moral certainty.

a reasonable doubt.... Penalizing prosecutors who defer actions [until doubt is eliminated] would subordinate the goal of 'orderly expedition' to that of 'mere speed.' *Smith v. United States,* 360 U.S. 1, 10, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959). This the Due Process Clause does not require." *Ismaili* 828 F.2d at 168 (quoting *Lovasco,* 431 U.S. at 791, 97 S.Ct. 2044, 52 L.Ed.2d 752); *see also Smallwood,* 51 Md.App. at 465–66, 443 A.2d at 1004–05.

Although the case remained open over the ensuing years, no additional evidence was found to change the judgment not to proceed with prosecution.[28] Then, in 1996, Detective Marll and his partner decided to re-interview the leads that Detective Capel had found. Marll testified he felt Detective Capel had not lacked diligence in pursing the case. He stated that Detective Capel was "an excellent detective. And anything he could have pursued he would have back then. I read the case folder. I feel he did an excellent job."

Detective Marll and his partner first focused on Chad Grimes, whose hair was on the red bandana, but when he was murdered in January 1997, they turned their attention to Mike Grimes. In March 1998, they prepared an arrest warrant based upon the probable cause they had and arrested Michael Grimes. He confessed to his role in the crimes and implicated Clark as the gunman. Based on this new evidence, Clark was promptly arrested and indicted in the instant case.

The investigation continued after Clark's arrest. Saliva from the red bandana was found to match Clark's DNA within a statistical calculation of one in 7.7 million people.[29] Another

---

**28.** Detective Marll testified on 16 September 1998 that "there was nothing in '86, actually through '96, that forced us to go back and work old cases. So the case would be sitting back there. It's not closed. If any information came in on it, somebody would have grabbed up on it and ran with it."

**29.** At Petitioner's trial on 15 April 1999, Charlotte Word, deputy laboratory director for Cellmark Diagnostics (the company that conducted the PCR/DNA test), explained the PCR/DNA test of the bandana:

Grimes brother, Mark Grimes, was also interviewed, and stated that he had overheard Clark admit to the murders in 1982. As Respondent explains:

> The reality of investigation is that sometimes a case can be thoroughly investigated and yield evidence insufficient to win at trial, and then later, a key piece of evidence "cracks" the case. That evidence may come in the form of an unexpected, albeit hoped-for, change in one of the suspect's stories, as it did here. The evidence could also come from a witness who comes forward for the first time because of a guilty conscience, or from an anonymous tip. While limited resources played a role in the timing of the re-interviewing of Mike Grimes, which produced the evidence that "cracked" the case here, there is nothing to say that re-interviewing Grimes at an earlier point in time after his initial denials would have yielded the same result. Indeed, Grimes testified that his brother Chad's murder in 1997 had a "big impact" on him, and contributed to his confession to Detective Marll.[30]

Respondent's Br., at 17. We conclude that there was no evidence that the State purposefully delayed indictment to gain a tactical advantage over Petitioner.[31] *Cf., e.g., Lovasco,*

---

[T]he statistical calculation in the Caucasion population is approximately one in 7.7 million.

> What that means is in theory we need to screen somewhere over a million individuals before we would expect to see this particular set one time.
> So it tells us it's a rare set of information.

She then clarified that Cellmark would have to screen roughly 7.7 million individuals before it would expect to find the same type of genetic profile.

**30.** Grimes explained that "[t]he dam broke," and he thought:

> It took a year for them [the police] to catch the guys that shot my brother. And I can't imagine waiting sixteen years to find out who killed somebody. That had a big impact on me.

**31.** The Seventh Circuit in *Sowa* determined that there was no purposeful delay on the part of the government as it was a difficult case to investigate, and the government had difficulty obtaining reliable witnesses and evidence against Sowa. *Sowa,* 34 F.3d at 451–52. Even more on point, the Fifth Circuit, in *Crouch,* in declining to employ the

431 U.S. at 790–95, 97 S.Ct. at 2049, 52 L.Ed.2d 752 (noting that the Government delayed prosecution on the "hope ... that others might be discovered who may have participated in the theft ...." and concluding that such a delay does not amount to a due process violation as warranted by the two part test); *Sowa*, 34 F.3d at 451–52 (approving delay because the Government acted promptly to charge defendant once they identified a reliable witness). Therefore, on this record, the trial court properly denied Petitioner's motion to dismiss.

### III.

■ As to the second question before us, we conclude that the trial court improperly excluded the relevant medical records of the witness, Michael Grimes, and foreclosed cross-examination of Grimes regarding related potential memory

---

balancing test, stated that lack of manpower and low priority assigned to an investigation does not necessarily amount to a due process violation. *Crouch*, 84 F.3d at 1513. The district court in *Crouch*, employing the balancing test, determined that "the reasons for delay 'lack of manpower' and the low priority which this investigation was assigned were 'insufficient to outweigh the actual prejudice to Crouch and Frye.' " *Id.* (citation omitted). The Fifth Circuit stated in response:

Finding these reasons "insufficient" is in substance determining that greater manpower *should* generally have been allocated to investigation and prosecution in that jurisdiction, and that a higher priority *should* have been assigned to this particular investigation. Yet those decisions are ones essentially committed to the legislative and executive branches, and the case for judicial second guessing is particularly weak where it is directed at preindictment conduct and is supported not by any specific constitutional guaranty or by any long-established tradition of judicial oversight, but only by the general contours of the due process clause.

*Id.* (footnotes omitted). The Fifth Circuit, in a footnote, further explained:

If all the manpower that could reasonably be expected has been furnished and the highest reasonably appropriate priority has been assigned to the matter, then the due process violation must necessarily rest on prejudice alone, contrary to *Lovasco.*

*Id.* The court concluded that employing a balancing test wrongly leads the court to "grading or evaluating the merit of resource allocation and management decision that are properly the province of the executive and/or legislative branches. Delay due to such causes is *fundamentally unlike intentional delay to gain tactical advantage or for other improper purpose.*" *Crouch*, 84 F.3d at 1514 (emphasis added).

problems Prior to trial and pursuant to subpoena, Petitioner obtained records from the Maryland Workers' Compensation Commission pertaining to a claim filed by Michael Grimes. The records indicated that, on 30 April 1991, Michael Grimes was the victim of an industrial accident. On 3 June 1991, he filed a claim with the Workers' Compensation Commission in which he stated: "I was unloading a hopper of lime and ash when the door pushed open to the hopper. I fell from a ladder and was burned by the hot lime and ash." Grimes also claimed that he suffered other physical and psychological injuries from the incident.

As part of his post-accident treatment, Grimes began to see a psychologist, Dr. Joseph M. Eisenberg. In July 1991, Dr. Eisenberg conducted a psychodiagnostic evaluation of Grimes. In a report of that evaluation, he stated that shortly after Grimes was released from the hospital several symptoms developed, including memory problems. In a letter dated 30 September 1991, Dr. Eisenberg related that Grimes was being treated for "a set of emotional disorders that are a direct consequence of the accident." Throughout the period of treatment, Dr. Eisenberg took progress notes and, on 7 April 1992, he observed:

> [Michael] forgot his appointment today, but I made time to see him in spite of his having missed his scheduled hour. During the course of the session, he described how he has difficulty with memory "at least five times a day," and he tends to feel demeaned and "stupid" because of his memory difficulties.

The State filed a motion to preclude the defense from inquiring into Grimes's medical history following the 1991 industrial accident. Immediately preceding the direct testimony of Michael Grimes at Petitioner's trial on 14 April 1999, the trial court considered whether to permit Petitioner to question Grimes about his reported memory problems. After noting that the State had filed a written motion to preclude the defense from inquiring into Grimes's psychiatric history, the trial judge observed that, although the entire Workers' Compensation Commission file was available, "nothing the Court

has found ... would go to whether or not ...—it would affect his memory as such." The following colloquy occurred:

DEFENSE COUNSEL: Judge, would I be allowed to ask if he filed a worker's comp-claim alleging some type of psychiatric disability.

THE COURT: I think I'll let you ask that question and consider letting him answer yes or no.[32]

\* \* \*

DEFENSE COUNSEL: Now I've looked at the notes that were in here, and it's interesting, your Honor, that you talk about memory. I'm going to hand this here up to you. He was being interviewed by one of the therapists.... During the course of the sessions he has described how he has difficulty with memory at least five times a day and he tends to feel demeaned and stupid because of his memory difficulties.

\* \* \*

STATE'S ATTORNEY: Judge, I haven't been shown this and haven't had a chance to look over this. I did have a glance at this. It's dated April 14, 1992[sic].[33] I think that the cases that have been cited, specifically the case [defense counsel] was kind enough to direct us to last week, *Reese versus State*,[34] which is also what the Court looks at, that's

---

32. Petitioner and Respondent, in their briefs, and the Court of Special Appeals in its unreported decision, noted that defense trial counsel ultimately failed to ask this question. Petitioner supposes that "[t]his may have been because the trial court later ruled that the mere fact that [Mr. Grimes] may have subsequent [to the time of the murders] had some psychiatric problems is inadmissible." In this regard, both Petitioner and Respondent note that counsel may not have asked this question because, without being able to establish that the psychiatric problems related to memory loss, the question and answer were not probative of Grimes's credibility. *See* Joseph F. Murphy, Jr., MARYLAND EVIDENCE HANDBOOK § 1302(D), at 506 (3d ed. 1999) ("It is improper to ask the witness, 'Are you under the care of a psychiatrist?' People receive psychiatric treatment for reasons that have nothing to do with any component of credibility." (citations omitted)).

33. The progress note is actually dated 7 April 1992.

34. *Reese v. State*, 54 Md.App. 281, 458 A.2d 492 (1983).

relevancy issues here. The first thing that *Reese* says, and which Judge Murphy says in his evidence handbook, is that it is impermissible to simply just ask about psychiatric treatment.

Clearly if [defense counsel] is allowed to just simply ask whether or not Mr. Grimes has filed for disability claiming a psychiatric disorder, the Jury then has no idea. And I believe it's done only in essence to—it's not probative of any sort of relevant trait regarding his truthfulness or his ability to observe or to remember. It is only in an effort to sort of intimidate or harass, which is what *Reese* is trying to guard against.

If he asks that question because he knows—and defense counsel knows that the claim was for depression and substance abuse, that certainly isn't relevant to his ability to testify truthful [sic], which the case addresses.

So I don't even believe that it's permissible that he asks, specifically knowing that the claim was filed for depression and substance abuse,[35] which has nothing to do with, back in 1982, his ability to observe and to perceive what was happening around himself.

Certainly he wasn't hallucinating or delusional back then. There is no evidence of that. In 1999 we have no evidence that he is delusional or hallucinating or has a problem with memory or perception.

Those are the two relevant types I believe that the Court is supposed to be looking at when determining whether or not the psychiatric history of a witness is admissible. And there's just been nothing provided. And certainly there's been no expert to say that someone who is suffering from depression or substance abuse is then likely to be delusional or hallucinate or have a lack of memory.

I don't see how it all comes in.

---

**35.** Petitioner, in his brief, disagrees with the State's characterization of Grimes's claim. Petitioner notes that the list of symptoms resulting from his accident, as documented in the psychodiagnostic evaluation, does not include substance abuse.

* * *

DEFENSE COUNSEL: Now memory is something that comes and goes. This case happened many, many years ago. And it's got to do with this witness and his ability to accurately recall certain events. And he states it right there, he's got memory problems.

THE COURT: That was in '92.

DEFENSE COUNSEL: Yeah. But, like I said, memory comes and goes.

THE COURT: I understand that.

DEFENSE COUNSEL: And it did happen. And this happened between now and that event sometime.

I think it's fair game.

THE COURT: I'll answer your first question first. I'm going to dump it right on Chief Judge [Joseph F.] Murphy [Jr.]'s lap. And he talks about something that would affect the veracity and credibility of a witness at the present time he witnessed the event.

There's no indication whatsoever at the time he witnessed this event or the time frame that he's talking about back in 1982 that there was anything wrong with him. And that workmen's comp claim that was filed much later and the reports concerning his memory were in 1992. So I'm going to dump it in his lap and say it did not concern the time frame and the mere fact that he may have subsequent thereto had some psychiatric problems is inadmissible.

The Court of Special Appeals, as noted *supra*, determined that the trial court did not abuse its discretion in not permitting the cross-examination as "Grimes's 1992 psychiatric problems were not a proper subject of inquiry because they did not relate to his perception at the time of the criminal incident." On appeal, Petitioner argues the following:

The trial court, in denying petitioner the opportunity to question [Michael] Grimes about his self-reported memory problems, and the Court of Special Appeals, in affirming the lower court's ruling, both focused on the issue of perception at the time of the crime, not accuracy of memory and

recollection years later. Accuracy of memory and recollection, however, are clearly appropriate subjects of cross-examination.

Petitioner further contends that because the accuracy of Grimes's memory and recollection were relevant, it should have been the subject of cross-examination. We agree with Petitioner.

Accuracy of memory and recollection are appropriate subjects for cross-examination. Chief Judge Murphy of the Court of Special Appeals, in his *Maryland Evidence Handbook*, states with regard to recollection:

> How good is the witness's recollection? How intelligent is he? How accurate is his memory? No matter how honest the witness happens to be, it is entirely *proper* to demonstrate his lack of capacity or opportunity to recall the relevant event.

Murphy, *supra*, § 1301(B), at 493 (emphasis added). In *Wharton's Criminal Evidence*, it is said:

> A witness may be cross-examined for the purpose of testing his recollection. The cross-examiner is allowed great latitude in testing a witness's recollection and accuracy. The witness may be asked any question which would probe the accuracy of the witness's memory. Indeed, in the trial judge's discretion, the witness may even be questioned regarding irrelevant matters for the purpose of testing the witness's memory. The witness may be asked about anything that tends to show an inability to recall and to testify accurately, provided counsel has a good faith basis for the question.

B. Bergman and N. Hollander, 2 WHARTON'S CRIMINAL EVIDENCE § 9:07, at 598–99 (15th ed 1998).

We have not addressed this question directly; however, in *Martens Chevrolet v. Seney*, 292 Md. 328, 339, 439 A.2d 534, 540 (1982), we stated:

> It is hornbook law that when a person testifies as a witness, generally he may be cross-examined on such matters and facts as are 'likely to affect his credibility, *test his memory*

*or knowledge,* show his relation to the parties or the cause, his bias or the like . . . .'

*Id.* (emphasis added) (quoting *Kantor v. Ash,* 215 Md. 285, 290, 137 A.2d 661, 664 (1958)). In addition, Maryland Rule 5–616(a)(6),[36] impeachment by inquiry of the witness, states that the "credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at . . . [p]roving lack of personal knowledge or weakness in the capacity of the witness to perceive, remember, or communicate . . . ." Maryland Rule 5–616(b)(4), concerning extrinsic impeaching evidence, states that "[e]xtrinsic evidence of a witness's lack of personal knowledge or weaknesses in the capacity of the witness to perceive, remember, or communicate may be admitted if the witness has been examined about the impeaching fact and has failed to admit it, or as otherwise required by the interests of justice."

Respondent acknowledges generally that the accuracy of a witness's memory is a fit subject for exploration on cross-examination, but argues that Petitioner "utterly failed to demonstrate that the proffered evidence, i.e., a self-report of memory problems from 1992, had an bearing on Grimes's ability to perceive the events at the time of the crimes in 1982, or to recall the events in 1982 at the time of the trial," and "[a]bsent this link, the evidence of Grimes's memory problems in 1992 is irrelevant, and was properly held to be inadmissible." We determine otherwise and conclude that the relevancy of the obviously intended line of questioning was demonstrated, particularly in determining whether Grimes had lingering memory difficulties at the time of his testimony at Clark's trial in 1999.

 Respondent correctly notes that initially it is committed to the sound discretion of the trial court to determine the admissibility of evidence. *See* Md. Rule 5–104(a) ("Prelim-

---

**36.** There is no federal counterpart for Maryland Rule 5–616. *See Blair v. State,* 130 Md.App. 571, 593, 747 A.2d 702, 716 (2000); Alan D. Hornstein, *The New Maryland Rules of Evidence: Survey, Analysis and Critique,* 54 Md.L.Rev. 1032, 1037 (1995).

inary questions concerning ... the admissibility of evidence shall be determined by the court"); *see also Hopkins v. State,* 352 Md. 146, 158, 721 A.2d 231, 237 (1998). Trial courts are afforded "broad discretion in the conduct of trials in such areas as the reception of evidence." *Hopkins,* 352 Md. at 158, 721 A.2d at 237 (internal quotation marks omitted) (quoting *Void v. State,* 325 Md. 386, 393, 601 A.2d 124, 127 (1992)). "Accordingly, in our appellate review, we extend the trial court great deference in determining the admissibility of evidence and will reverse ... if the court abused its discretion." *Id.* (citations omitted).

A threshold requirement for the admission of any evidence is that the evidence be relevant. *See Conyers,* 354 Md. at 176, 729 A.2d at 933 ("Of critical importance ... is that any proffered evidence must be relevant."); Md. Rule 5–402 ("Except as otherwise provided by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules, all relevant evidence is admissible. Evidence that is not relevant is not admissible."). Maryland Rule 5–401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "Even if relevant, however, evidence can be excluded if 'its probative value is substantially outweighed by the danger of unfair prejudice.'" *Hopkins,* 352 Md. at 159, 721 A.2d at 237 (quoting Md. Rule 5–403). Lastly, a party seeking to admit impeachment evidence is in no way relieved of the obligation to show that the evidence is relevant to the witness's ability to perceive or to remember the events about which he is testifying. *Cf. Blair v. State,* 130 Md.App. 571, 596, 747 A.2d 702, 715 (2000) ("Md. Rule 5–616(c) does not relieve a party seeking to admit a statement under the rule of the obligation to show the statement's relevance.").

Petitioner relies heavily on *Reese v. State,* 54 Md.App. 281, 458 A.2d 492 (1983), for his position that he should be entitled to question Michael Grimes about his self-reported memory

problems. In *Reese*, the appellant, upon the testimony of the victim, Donald Major, was convicted of robbery with a deadly weapon by a jury in the Criminal Court of Baltimore. *Reese*, 54 Md.App. at 282, 458 A.2d at 493. "Before, during and after the trial appellant sought leave to probe the psychiatric history of the victim and to cross-examine him regarding related matters." *Reese*, 54 Md.App. at 283, 458 A.2d at 494. The information before the trial court related that the victim had been hospitalized before and after the crime and "at least twelve times in the last several years." *Id.* The Medical Administrator explained that the victim's diagnosis was "mixed emotional disturbance and borderline personality," which was described as:

> Essentially a borderline personality individual is someone who experiences from time to time under stress episodes of psychosis or losing touch with reality and comes back into reality fairly easily.

*Id.* The Administrator added that "if [the victim] had been out of touch with reality at the time of the offense he would not be able to recollect issues in any kind of detail." *Reese*, 54 Md.App. at 284, 290, 458 A.2d at 494 (internal quotation marks omitted). The trial court declined to permit appellant to question the victim/witness on this basis. *Id.*

> The Court of Special Appeals reversed and stated that

> had appellant been permitted to elicit even that much of a basis upon cross-examination of the victim, a serious question would have been cast on the victim's recollection of the appellant's participation in the episode. The appellant's peculiar explanation of a limited participation may or may not have been believed, but ... he had a right to have his version fully in balance before the factfinder.

*Reese*, 54 Md.App. at 290, 458 A.2d at 497. In so concluding, the intermediate appellate court noted that the scope of cross-examination is within the discretion of the court, that generally a witness may be questioned on any relevant matter, that the witness's credibility is always relevant, and that the trial judge, within his or her discretion, must preclude harassment of the witness on cross-examination. *Reese*, 54 Md.App. at

286, 458 A.2d at 495 (citing *Conner v. State,* 34 Md.App. 124, 133, 366 A.2d 385 (1976); *Smith v. State,* 273 Md. 152, 157, 328 A.2d 274 (1974); *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed.2d 624 (1931)). The court also noted that the U.S. Supreme Court described the trial court's discretion regarding the scope of cross-examination

as the principal means by which the believability of a witness and the truth of his testimony are tested. Acknowledging 'the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation,' the Court in *Davis v. Alaska,* 415 U.S. 308, 316, [94 S.Ct. 1105, 39 L.Ed.2d 347] (1974), pointed out that a cross-examiner is not only permitted to delve into a witness's perceptions and memory, but the cross-examiner is allowed to impeach, 'i.e., discredit' the witness.

What is referred to as 'broad discretion' of the trial judge, upon examination, becomes a rather narrow one. The right to discredit an accuser being one of constitutional dimension, *Davis, supra,* can be but limitedly circumscribed. It appears that only to the extent that the examination strays from extracting from a witness that which discredits the credibility of his testimony, and broaches upon an effort rather to humiliate his person that the duty to protect at the other end of the spectrum arises. . . .

\* \* \*

The "discretion" then, between the defendant's right to discredit testimony and the trial judge's duty to protect a witness is solely one of relevance of the questions to the witness's credibility. The relevancy test at this juncture does not regard the elucidation of one of the main issues at trial, it is whether the answer elicited will be a useful aid to the court or jury in appraising the credibility (not necessarily the veracity) of the witness and in assessing the probative value of his direct testimony. McCormick, HANDBOOK OF THE LAW OF EVIDENCE, § 29 (2d ed.1972).

*Reese,* 54 Md.App. at 286–87, 458 A.2d at 495–96.

The Court of Special Appeals continued:

In determining the relevance of an inquiry into a witness's psychological instability, there is some room for discretion such as defining whether the particular disorder affects factors of credibility like memory, observation, exaggeration, imagination, etc. But even that limited sphere is further restricted by the weight of the evidence so indicating. The proffer need not be that proof beyond a reasonable doubt, or even by a preponderance of evidence, will show that such disorder is or was prevalent. It need only show that inquiry is likely to so divulge such a defect in the witness.

*Reese*, 54 Md.App. at 289, 458 A.2d at 497. The Court concluded, "[i]t is enough to compel a reversal that a constitutional right was improperly restricted leaving prejudice an obvious possibility." *Reese*, 54 Md.App. at 291, 458 A.2d at 498.

Respondent incorrectly concludes that Grimes's 1992 self-reported memory problem is so different from the situation in *Reese* that Grimes's condition was irrelevant. Respondent asserts that the memory problem was irrelevant because the report of the condition was distant in time from both the events that were the subject of Grimes's testimony and the time he testified about them. Respondent is correct that there was no indication from the record whether Michael Grimes suffered memory problems at the time of the crimes in 1982 or at the time of the trial in 1999; however, as Petitioner points out, "[t]he fact that he reported his memory problems to a therapist in 1992 did not mean that the problems no longer existed when he testified in 1999." Petitioner's Br., at 38. As the Court of Special Appeals stated in *Reese*, "a proffer to permit an initial question regarding credibility needs but minimal support. Apparently, it need be little more than an 'articulable suspicion,' or at most 'probable cause' to believe that the facts elicited will be relevant to credibility." *Reese*, 54 Md.App. at 288, 458 A.2d at 496 (citation omitted).

We further disagree with Respondent's argument that "[n]othing about Grimes's memory problems in 1992 suggests that it was a matter 'likely to ... test his memory or knowl-

edge' about events long past,'" Respondent's Br. at 29 (quoting *State v. Cox*, 298 Md. 173, 178, 468 A.2d 319 (1983)), and with Respondent's attempt to "diagnose" Grimes's memory problems as merely "short-term memory loss." *Id.* Upon inquiry, Grimes may have acknowledged that he still suffered from memory problems or he may have testified that all of his memory problem had resolved long ago. He may have stated that, although he still suffered from memory problems, his memory of the crime was quite clear. In any event, the topic was relevant and Petitioner had the right to cross-examine Grimes on the subject.[37] As in *Davis v. Alaska, supra,*

> We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green's testimony which provided 'a crucial link in the proof ... of petitioner's act.' ... The accuracy and truthfulness of Green's testimony were key elements in the State's case against petitioner.

*Davis,* 415 U.S. at 317, 94 S.Ct. at 1111, 39 L.Ed.2d 347 (alterations in original) (citations omitted).

We agree with Petitioner that defense counsel's purpose in asking Grimes about his past memory problems was not to embarrass or humiliate the witness, but was to determine the reliability of his memory in 1999 with regard to his testimony concerning events allegedly occurring in 1982. The potentially impeaching information could have been elicited without revealing that its source was a psychiatric record, thereby eliminating the concerns expressed by the Court of Special Appeals. The Court of Special Appeals relied on a passage, *supra* p. 11, from Chief Judge Murphy's *Maryland Evidence Handbook,* to illustrate that the trial court did not abuse its

---

**37.** All testimony about past events, as opposed to documentary evidence, is based on memory. As such, the matter of memory is ordinarily relevant; always impeachable.

discretion because it would be improper to ask the witness, "Are you under the care of a psychiatrist?" Yet, asking that precise question is not necessary to determine whether Grimes suffered from any memory impediment at the time of his testimony. For example, the witness could be asked whether he had suffered an industrial accident in 1991 and whether, as a result, he experienced, and continued to experience, problems with memory.

What may be a more significant consideration in permitting this line of questioning is the importance of Grimes's testimony to the State's case. It seemed to make a critical difference to the State between only having probable cause to charge Petitioner and being able to try him. In 1982, Grimes denied any knowledge of the crime, but when questioned in 1998, Grimes admitted his involvement, agreed to plead guilty, and to testify against Petitioner. Petitioner was arrested the next day. At the motions hearing on 16 September 1998, Detective Marll agreed that as a result of Michael Grimes's statements Petitioner had been arrested.[38] In light of the apparent importance of Grimes's testimony to the State's case, cross-examination regarding Grimes's memory in 1999 of events allegedly occurring over sixteen years earlier should have been allowed.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND THE*

---

**38.** The following colloquy occurred between Petitioner's trial attorney and Detective Marll:

[PETITIONER'S TRIAL ATTORNEY]: [Y]ou got another man sitting here who is going to stand trial in this case, basically as a result of things that Charles Mike Grimes has stated after his arrest, correct? Isn't that how it basically stacks up?
[DETECTIVE MARLL]: That's correct. . . .

*COURT OF SPECIAL APPEALS TO BE PAID BY BALTI- MORE COUNTY.*

BELL, C.J., joins in the result only.